**2024 UT App 76**

# THE UTAH COURT OF APPEALS

ROBERT WAKEFIELD,
Appellant,
*v.*
DAVID A. GUTZMAN,
Appellee.

Opinion
No. 20220256-CA
Filed May 23, 2024

Fourth District Cou rt, Provo Department
The Honorable Robert A. Lund
No. 150400386

Emily Adams, Sara Pfrommer, and Freyja Johnson,
Attorneys for Appellant

Tawni J. Anderson and Tucker Finch Levis,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES GREGORY K. ORME and RYAN D. TENNEY
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     Jared Wakefield died while he was undergoing routine dental surgery. Jared's father, Robert Wakefield, sued Dr. David A. Gutzman, the anesthesiologist responsible for sedating Jared during the procedure, alleging medical malpractice.[1] The case proceeded to trial, and the jury returned a defense verdict, finding

---

1. Because Jared and Robert share the same last name, we refer to them by their first names for clarity, with no disrespect intended by the apparent informality. We also refer to the doctors by only their last names throughout this opinion for convenience and intend no disrespect.

that Gutzman did not breach the standard of care. Thereafter, the district court denied Robert's post-trial motion seeking judgment as a matter of law or a new trial. Robert now appeals, and we affirm.

## BACKGROUND

*Jared's Dental Surgery and Death*

¶2      In June 2014, twenty-two-year-old Jared had surgery at the Smile Center dental office to repair several cavities, place a crown, and extract teeth. There were three medical professionals in the room during the surgery: Dr. Dennis J. Blume, Tia Underwood, and Gutzman. Blume was the general dentist performing the dental work on Jared. Underwood was Blume's dental assistant. Gutzman was the dental anesthesiologist administering the anesthesia.

¶3      Before Blume started performing the dental work, Gutzman sedated Jared and placed a "throat pack" in Jared's throat. The throat pack was made up of three to four two-by-two-inch gauze pads fanned out in the oral cavity above the throat. The throat pack is used "to protect the airway" during a dental procedure so that "nothing goes down the throat."

¶4      After Blume completed the dental work, Gutzman removed the throat pack. Once the throat pack was removed, there was no gauze left in Jared's mouth. But "right after" the throat pack was removed, Blume or Underwood placed gauze at the extraction sites to stop bleeding and absorb blood. The size and type of gauze used to control the bleeding was identical to that of the gauze used in the throat pack.

¶5      At this point, Jared was still sedated. Gutzman then began to bring Jared out of sedation. Gutzman stopped the anesthesia, started administering oxygen, and sat Jared up in his chair.

Between five and ten minutes after Jared had been sitting up in the chair recovering, he suddenly started coughing and moving his arms and hands. Gutzman approached Jared and used his fingers to remove the gauze that had been placed at the extraction sites to control the bleeding. Jared continued to cough, which both Blume and Gutzman encouraged because it meant he was "moving air." But then Jared made a "choking sign," at which point Gutzman recognized that although Jared was breathing it "wasn't adequate"; Jared was not getting enough air and he was in "respiratory distress." Thereafter, Gutzman attempted multiple efforts to restore Jared's airway, none of which were successful.

¶6      Sometime after Jared went into respiratory distress, office personnel at Smile Center called 911 to report that Jared was not breathing but had a pulse. Shortly after paramedics arrived on scene, Jared had no pulse. Paramedics transferred Jared to the hospital, where he was resuscitated. A doctor in the critical care unit at the hospital performed an evaluation of Jared's airway. He discovered a piece of white gauze sitting above the division between the right and left lung; the gauze was restricting Jared's airway. The doctor removed the gauze, but Jared did not recover. Two days later, Jared died from an anoxic brain injury.

*Robert Files Suit Against Gutzman, Blume, and Smile Center*

¶7      In 2015, Robert, on behalf of Jared's estate, filed two lawsuits. The first suit was against Gutzman and Blume, alleging claims for medical malpractice and wrongful death. The second suit was against Smile Center, alleging that Smile Center was responsible for Jared's death under the theory of respondeat superior. Approximately one year after the lawsuits were filed, the parties had a discovery dispute concerning the release of Robert's medical records related to his mental health, suffering, and treatment, which Gutzman argued were relevant to Robert's wrongful death claim. At a hearing on the dispute, the district

court indicated its belief that Robert's psychological condition was irrelevant because the complaint against Gutzman and Blume alleging wrongful death was filed "on behalf of the decedent" and not on behalf of Robert as an individual. *See Estate of Faucheaux v. City of Provo*, 2019 UT 41, ¶¶ 10–14, 449 P.3d 112 (explaining that Utah law "precludes an estate from bringing a wrongful death claim on its own behalf" and holding that a wrongful death claim "should be filed by the heirs of the decedent or by a personal representative of an estate on the heirs' behalf").

¶8 Following the hearing, Robert moved to amend the complaints in both cases to add himself and Jared's mother as plaintiffs individually. The court granted the motion as to the Smile Center complaint but denied it as to the Gutzman and Blume complaint. Thereafter, Robert filed several motions asking the court to reconsider its ruling in the Gutzman and Blume case, but the court denied those motions. In 2017, the cases were consolidated. Shortly before trial, Robert settled the claims against Blume and Smile Center.

*The Department of Professional Licensing Petition and Subsequent Stipulation*

¶9 After Jared's death, Gutzman self-reported the event to the Utah Division of Professional Licensing (DOPL), which oversees medical and dental licensing. In his letter reporting the event to DOPL, Gutzman stated that Jared's death was "[a] very unfortunate, freak accident," but he did not admit any "medical malpractice," "negligence," or "wrongdoing."

¶10 Without contacting Gutzman, DOPL investigated the event and filed a notice of agency action to initiate a licensing action through a formal adjudicative proceeding before an administrative law judge. The notice explained that the action was based on allegations contained in a verified petition prepared by DOPL (the DOPL Petition). Gutzman was invited to respond to

the "violations alleged" in the DOPL Petition. A two-day evidentiary hearing was scheduled to allow both sides to present their cases to a fact finder. At the close of the hearing, an administrative law judge would make findings of fact, conclusions of law, and recommendations.

¶11 The DOPL Petition did not include any findings of fact or conclusions of law but was instead limited to allegations that were "based upon information provided by witnesses and by a [DOPL] investigator" as well as "information and belief the investigator obtained during his investigation." The allegations generally summarize the events and, as relevant to this appeal, include an allegation that Gutzman violated the standard of care in his treatment of Jared. That allegation states,

> A review of [Jared's] dental records, medical records, and the statements of [Gutzman and Blume] was conducted by a board certified oral and maxillofacial surgeon with significant training and experience in delivering anesthesia to patients, who provided an expert opinion to [DOPL] stating that [Gutzman's] treatment of [Jared] violated the applicable standard of care . . . .

The unnamed expert opined that Gutzman violated the standard of care in five ways, including by failing to place an adequate throat pack and by failing to account for all the pieces of gauze used during the procedure.

¶12 Ultimately, Gutzman and DOPL entered into a stipulation and order (the Stipulation) in 2016, and as a result, the licensing action never reached an evidentiary hearing. As part of the Stipulation, DOPL made five findings of fact, three of which are relevant here: (1) Gutzman sedated Jared during a dental procedure; (2) "[f]ollowing the procedure, [Jared] aspirated a 2 inch by 2 inch piece of gauze"; and (3) Jared died from an anoxic

brain injury due to aspiration of the gauze. "[W]hile neither admitting nor denying the findings of fact," Gutzman stipulated that DOPL "believes the findings of fact may be considered unprofessional conduct," and he agreed to certain restrictions on his license during a two-year probationary period.

*The DOPL Petition Is Excluded From Trial*

¶13 Prior to trial in the lawsuit filed by Robert, Gutzman filed a motion in limine seeking to exclude "any evidence" regarding the DOPL proceedings. He first argued that the allegation in the DOPL Petition referencing the unnamed expert's opinion that Gutzman "breached the standard of care" was hearsay that was not subject to a hearsay exception. Moreover, he asserted that even if this allegation was excluded, "any mention of a DOPL proceeding" should be excluded under rule 403 of the Utah Rules of Evidence as more prejudicial than probative because lay jurors unfamiliar with administrative proceedings "would simply assume DOPL's actions were correct." He posited that combatting this assumption would require a "trial within a trial" to explain "all the reasons why the DOPL proceeding was not the trial."

¶14 In response, Robert argued that the DOPL Petition was admissible under the hearsay exception for investigative reports of a government agency. Regarding exclusion under rule 403, Robert asserted that although the DOPL Petition was prejudicial, it was not *unfairly* prejudicial and therefore it should be admitted. According to Robert, "DOPL's conclusion that the actions of [Gutzman] fell below the standard of care do not 'shift the fact finder's attention away from the proper method for resolving the negligence issue.'" (Quoting *Woods v. Zeluff*, 2007 UT App 84, ¶ 7, 158 P.3d 552.)

¶15 The district court excluded the DOPL Petition but admitted the Stipulation, reasoning as follows:

> I find as to this issue that the [DOPL Petition is] not relevant. And [its] probative value is substantially outweighed by the prejudicial effect because they are just allegations. I find the converse is true as to the [Stipulation]. I find the [Stipulation] to be extremely relevant. In fact, it's hard to think of any evidence that would be more probative in this case other than admissions by the doctor than the findings of the licensing entity. That evidence is extremely probative, and that document does fit squarely within evidence Rule 803(8) as a public record in that it sets out the factual findings of a legally authorized investigation. DOPL is a state agency. They are independent. They retained folks outside of this case.

Lastly, the court noted that the Stipulation was not unduly prejudicial because Gutzman "denied the underlying facts" and he "denied liability."

*Trial*

¶16　Having settled his claims against Blume and Smile Center, Robert proceeded to trial solely against Gutzman. The main question at trial was whether Gutzman breached the standard of care in his treatment of Jared.

¶17　Robert called multiple fact witnesses during his case-in-chief, including himself, Underwood, Blume, and Gutzman.

¶18　Underwood testified that neither she nor Gutzman counted the number of gauze pieces before placing them in Jared's mouth. Relying on her contemporaneous notes from the day of Jared's procedure, Underwood testified that Jared began coughing and choking "[o]nce treatment was completed." Although she could not remember precisely when Gutzman

removed the throat pack, she explained that "[t]ypically it's removed when all of the dental work is completed."

¶19 Blume testified that Gutzman was responsible for placing and removing the throat pack. He did not remember the exact point in the procedure when Gutzman had removed the throat pack, but he agreed with Gutzman's statement that it had been removed "prior to Jared coughing and giving the choking sign." Blume admitted that "[t]he gauze placed at the extraction sites for Jared . . . was placed either by [him] or [Underwood]," and he agreed that Gutzman "[did] not place the gauze at the extraction sites." Moreover, Blume acknowledged that he did not count the number of gauze pieces he placed in Jared's mouth at the extraction sites, even though he is "ultimately in charge of the gauze at the extraction sites."

¶20 Robert also called one expert, Dr. Joel E. Colley, to testify about the standard of care. Colley is a "board-certified anesthesiologist" with a certification in advanced cardiac life support. He explained that although his training was slightly different than Gutzman's in that Colley had completed a "full residency" whereas Gutzman had completed only one year of training, both "occupy the same position with the patient." In addition, Colley had "worked with dental patients many times," and the responsibilities were always the same: "Airway management, physiological management."

¶21 Colley testified that Gutzman's treatment of Jared fell below the standard of care for several reasons. First, Jared had a number of things in his mouth that were "loose" and "unaccounted for." Colley explained that the gauze used for Jared's throat pack should have been secured together and "tagged," meaning that the gauze is attached to "an 8- to 10-inch string that stays outside the mouth so that it can be retrieved at all times." Moreover, every item put in Jared's mouth, including each individual piece of gauze, should have been counted both "before

the procedure and after the procedure" to ensure that nothing was left in the mouth.

¶22    Second, Colley opined that due to Jared's size and the type of procedure, Jared "should have been intubated from the beginning." Colley explained that Jared was under general anesthesia during the procedure and that as a result he was "totally out" and "not responding."

¶23    Third, Colley testified that Gutzman's responsibility to protect Jared's airway did not end when he removed the throat pack. Rather, he testified that the responsibility of an anesthesiologist "remains in force until the patient is actually ready to be discharged from the facility." Thus, according to Colley, Gutzman was responsible for maintaining awareness of any gauze left in Jared's mouth during the recovery period, even after he had removed the throat pack.

¶24    Fourth, Colley took issue with Gutzman's care of Jared after Jared's airway had been obstructed. Colley opined that Gutzman should have "quickly" realized that Jared had aspirated a foreign object, at which point Gutzman was "obligated to do anything" possible "to get past [the] obstruction." Colley concluded that Jared would have lived if Gutzman had followed the correct emergency protocol.

¶25    During cross-examination, Colley testified that at the time he was deposed, he had never performed a procedure where he had personally placed tagged gauze in a patient's mouth. He also explained that he formed his opinions about the case before reviewing the depositions of any of the treating providers, including Gutzman. He conceded that "[t]he standard of care may include more than one acceptable method of treatment," and he agreed that even "under the best of circumstances, under the best of care, medical complications can and do occur without any fault on the part of the medical team."

¶26 At the close of his case-in-chief, Robert moved for a directed verdict on the issue of liability, arguing that he had met all the elements of res ipsa loquitur, i.e., that Jared's death would not have happened unless Gutzman was negligent. The district court denied the motion, finding it premature because Gutzman had not yet fully presented his case and because res ipsa loquitur "only provides an inference" of liability that "[t]he jury is entitled to accept or reject."

¶27 Gutzman presented his case-in-chief through his own testimony and the testimony of two experts. For his part, Gutzman testified that his "primary function" was to protect Jared's airway "during the procedure." He maintained that he "protected the airway during the procedure," and he explained that "[o]nce the procedure was done," he "removed the throat pack" and Blume or Underwood "place[d] the gauze for the extraction sites." Gutzman acknowledged that he did not know the exact number of gauze pieces in Jared's mouth at the time Jared aspirated. However, he asserted that he was responsible for preventing items from going down the airway only during the procedure, meaning that after the procedure, he was "responsible for the gauze [he] put in" but not for the gauze placed by Blume.

¶28 Gutzman's first expert was Dr. Kim Keller, a general dentist with a license to perform in-office conscious sedation. At the outset of his testimony, Keller explained that he was qualified to perform conscious sedation, which is "moderate sedation." He explained that a patient under moderate sedation remains awake during the procedure; it is "unlike general anesthesia" or unconscious sedation—the type of sedation Jared was under during his procedure. Keller also stated that when working on a patient in his own dental practice, he simultaneously performs both the conscious sedation and the dental work.

¶29 After listening to Keller's qualifications, Robert moved to exclude him as an expert, arguing that Keller was "not qualified

to testify as to the standard of care of anesthesia in the in-office setting." He asserted that Keller had never performed a "deep sedation"; that he had never had a patient experience an emergency airway blockage; and that even as a dentist, he had never worked with or alongside an anesthesiologist. In response, Gutzman noted that Keller would not be "offering any opinions about deep sedation." Rather, Keller would talk about the period of time when Jared was in "moderate sedation," "which is the recovery period, which is where [Jared] was when he aspirated the gauze." As part of this, Keller would "talk about the gauze," including who placed it and whether it should have been tagged. The district court overruled Robert's objection and allowed Keller to testify as an expert in the "limited area" identified by the defense.

¶30 Keller opined that Jared was not deeply sedated at the time he aspirated the gauze but rather, that he was "recovering out of the deep sedation phase and entering into the moderate phase." Keller explained that recovery begins "when the medication begins to flush out of your system," which in this case occurred once the dental procedure was complete and Gutzman stopped administering sedation medication. Moreover, at the time he aspirated the gauze, Jared was coughing, moving around in the dental chair, and making a choking sign, all of which are, according to Keller, "deliberate movements" that do not occur when a patient is deeply sedated.

¶31 Keller testified that he had reviewed Gutzman's deposition and had no objections to Gutzman's use of the throat pack. He explained that Gutzman removed the throat pack at the end of the procedure, which is when they are "typically" removed. In addition, Gutzman reported that he counts the pieces of gauze used in his throat packs, which suggests he exercises "great care."

¶32 Based on his experience and review of Gutzman's and Blume's depositions, Keller testified—over Robert's objection—

that "his understanding" was that the gauze Jared aspirated had likely been placed by either Blume or Underwood. Keller then stated that neither Blume nor Underwood counted the gauze pieces prior to placing them and that it was the responsibility of both Blume and Underwood to make sure that the gauze was placed properly. Lastly, again over Robert's objection, Keller testified that Gutzman should not have initially suspected that Jared's respiratory distress was due to aspirated gauze.

¶33 Gutzman's second expert was Dr. Jeffrey Anton Kurrus, a pulmonologist and critical care expert. Kurrus opined that Jared aspirated the gauze "when he was in recovery after the anesthetic had been discontinued and when he had the initial cough." He explained that the gauze likely went all the way down into Jared's windpipe, where it would have been "impossible" for Gutzman to see during his resuscitation efforts. Lastly, Kurrus testified that Gutzman complied with the standard of care in his resuscitation efforts with Jared.

¶34 At the close of the evidence, the district court instructed the jury on the standard of care and on res ipsa loquitur. As reflected on the special verdict form, the jury found that Gutzman did not breach the standard of care in his treatment of Jared.

*Post-Trial Motion*

¶35 After trial, Robert filed a motion for judgment as a matter of law or, alternatively, for a new trial. He argued the district court should grant judgment as a matter of law on the res ipsa loquitur theory because Robert met the initial burden of putting forth evidence to invoke res ipsa loquitur and Gutzman did not put forth any evidence to rebut it. In the alternative, Robert argued the court should grant a new trial because Gutzman put on no admissible evidence of the standard of care that rebutted Robert's expert.

¶36    The district court denied the motion. In its ruling, the court explained that Robert was not entitled to judgment as a matter of law because the doctrine of res ipsa loquitur "provides only for a permissive inference rather than a presumption of negligence, which inference the finder of fact may choose to reject." And the court concluded that a new trial was not appropriate because "ample evidence supports the jury's verdict that [Gutzman] did not breach the standard of care."

ISSUES AND STANDARDS OF REVIEW

¶37    Robert now appeals, raising three issues for our review.[2] First, Robert argues the district court abused its discretion when it excluded the DOPL Petition from evidence at trial. "We review a trial court's decision to admit or exclude evidence under rule 403 using an abuse of discretion standard. We therefore will not overturn a lower court's determination of admissibility unless it is beyond the limits of reasonability." *State v. Downs*, 2008 UT App 247, ¶ 6, 190 P.3d 17 (quotation simplified); *see also State v. 633 East 640 North*, 942 P.2d 925, 929 (Utah 1997) ("Trial courts have wide latitude in making determinations of relevance, probativeness, and prejudice under rules 401 and 403.").

¶38    Second, Robert argues the district court abused its discretion when it overruled objections to Keller's expert testimony. "The trial court has wide discretion in determining the admissibility of expert testimony, and we will not reverse unless

---

2. Robert also argues the district court erred in denying his motions to amend the complaint so that a proper plaintiff could litigate the wrongful death claim. *See supra* ¶¶ 7–8. However, Robert acknowledged in his briefs and again at oral argument before this court that we need not consider this issue unless we overturn the jury's verdict. Because we conclude that the jury's verdict should stand, we do not address this issue.

the decision exceeds the limits of reasonability." *Balderas v. Starks*, 2006 UT App 218, ¶ 27, 138 P.3d 75 (quotation simplified).

¶39 Third, Robert argues the district court should have granted his post-trial motion for judgment as a matter of law or for a new trial. We review a court's decision to grant or deny judgment as a matter of law for correctness. *See USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 34, 372 P.3d 629. However, a court's ruling on a motion for a new trial based on insufficiency of the evidence is reviewed for abuse of discretion. *See id.* ¶ 31.

ANALYSIS

¶40 Robert argues the jury's verdict should be overturned because the district court abused its discretion when it excluded the DOPL Petition from evidence and overruled objections to Keller's expert testimony. In addition, Robert contends the court should have granted his post-trial motion for judgment as a matter of law or for a new trial. We address each argument in turn.

I. The DOPL Petition

¶41 The district court excluded the DOPL Petition from evidence at trial on the grounds that it was "not relevant" and because any probative value was substantially outweighed by its potential prejudicial effect. Robert argues that the court abused its discretion in making both determinations. Although we agree with Robert that the court abused its discretion in concluding that the DOPL Petition was "not relevant," we do not agree that the court abused its discretion in excluding the DOPL Petition on the alternative ground that it did not satisfy the rule 403 balancing test.

¶42 Under the Utah Rules of Evidence, only "[r]elevant evidence is admissible." Utah R. Evid. 402. Evidence is relevant if "it has any tendency to make a fact more or less probable

than it would be without the evidence" and "the fact is of consequence in determining the action." *Id.* R. 401. Taken together, these rules "establish a very low bar that deems even evidence with the slightest probative value relevant and presumptively admissible." *State v. Bravo*, 2015 UT App 17, ¶ 15, 343 P.3d 306 (quotation simplified), *cert. denied*, 352 P.3d 106 (Utah 2015).

¶43 In this case, the DOPL Petition meets the low bar for relevancy. The primary issue at trial was whether Gutzman breached the standard of care in his treatment of Jared. The DOPL Petition was created by DOPL, the licensing agency tasked with determining whether a professional has breached the standard of care, in response to Gutzman's self-report of Jared's death and complaints that Gutzman had engaged in unprofessional conduct. DOPL determined that these complaints warranted further investigation, and after obtaining additional information from witnesses and a DOPL investigator, DOPL concluded that it had enough information to file a formal licensing action against Gutzman. Thus, the DOPL Petition was relevant because it had some tendency to make it more or less probable that Gutzman breached the standard of care; indeed, it was created for the express purpose of initiating an administrative proceeding to determine whether Gutzman had breached the standard of care. The district court abused its discretion in concluding otherwise.[3]

---

3. At oral argument before this court, Gutzman acknowledged that the DOPL Petition was at least somewhat relevant. *Cf. State v. Bravo*, 2015 UT App 17, ¶ 15, 343 P.3d 306 ("Rules [401 and 402] define relevance in binary terms: Either evidence is relevant because it makes a fact of consequence more or less probable, or it is not because it does not." (quotation simplified)), *cert. denied*, 352 P.3d 106 (Utah 2015).

¶44 But even if the DOPL Petition satisfied the relevancy requirements under rules 401 and 402 and was therefore presumptively admissible, the district court did not abuse its discretion by excluding the DOPL Petition under rule 403. Under rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Utah R. Evid. 403. When engaging in this balancing test, the court "indulges a presumption in favor of admissibility." *State v. Burke*, 2011 UT App 168, ¶ 34, 256 P.3d 1102 (quotation simplified), *cert. denied*, 263 P.3d 390 (Utah 2011). Evidence is unfairly prejudicial only if it "creates an undue tendency to suggest decision on an improper basis." *Anderson-Wallace v. Rusk*, 2021 UT App 10, ¶ 23, 482 P.3d 822 (quotation simplified), *cert. denied*, 496 P.3d 716 (Utah 2021). Put differently, "it is evidence that may cause the jury to base its decision on something other than the established propositions of the case." *Id.* (quotation simplified).

¶45 The district court concluded that the "probative value" of the DOPL Petition was "substantially outweighed by the prejudicial effect" because the statements contained in the DOPL Petition are "just allegations." Robert argues the court abused its discretion in excluding the DOPL Petition on this basis because the DOPL Petition "did not contain unsupported allegations" but was instead the "product" of a DOPL investigation. We disagree.

¶46 First, the probative value of the DOPL Petition was low. As noted, the DOPL Petition was created by DOPL at the outset of an administrative proceeding to determine whether Gutzman had engaged in practices constituting unprofessional conduct. The DOPL Petition contained unproved "allegations," the validity of which were to be determined by an administrative law judge following an evidentiary hearing. Importantly, any disciplinary action arising from the allegations would not occur until *after* the close of an evidentiary hearing where both parties would be

permitted to put on evidence. And any action at that point would be supported by the administrative law judge's findings of fact and conclusions of law.[4]

¶47   But Gutzman elected to forgo pursuing this route when he entered into the Stipulation. By virtue of the Stipulation, the parties' need to submit evidence demonstrating the veracity of the

---

4. Robert cites *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988), for the proposition that a court may rely on opinions and conclusions contained in an investigative report where the report was created as part of an official investigation. *See id.* at 164. However, *Beech Aircraft* is factually distinguishable from the case at hand. In that case, an independent investigator, appointed on order of a United States Navy commanding officer and pursuant to authority granted in the Manual of the Judge Advocate General, was asked to investigate a plane crash that occurred while a Navy aircraft was participating in a flight training exercise. *Id.* at 156. In the six weeks following the accident, the investigator completed a thorough investigation, which included "a detailed reconstruction of a possible set of events" that could have led to the crash. *Id.* at 157. Then, based on this information, the investigator prepared a comprehensive report outlining "finding[s] of fact" and detailing his opinion of the cause of the crash. *Id.* The report was also "supported by some 60 attachments." *Id.* Here, the DOPL Petition was not created in response to an investigation even remotely as thorough as the one in *Beech Aircraft*, and it lacked the same indicia of trustworthiness as did the investigative report prepared by the identified investigator. Indeed, the allegation that Gutzman violated the standard of care was merely based on "[a] review of [Jared's] dental records, medical records, and the statements of [Gutzman] and [Blume]." This stands in stark contrast to the weeks long investigation in *Beech Aircraft* and the fact that the investigator's opinions in that case were based on data obtained from a reconstruction of the accident.

allegations in the DOPL Petition was eliminated. As a result, there was no way to evaluate the conclusions of the unnamed expert who opined that Gutzman breached the standard of care. Indeed, the expert never had to reveal his or her precise expertise or training, and a finder of fact was not tasked with evaluating the expert's credibility, opinion, or bases for the opinion.

¶48    In contrast, the danger of unfair prejudice was high. Robert sought to admit the DOPL Petition largely because he wanted the jury to hear the unnamed expert's opinion that Gutzman had breached the standard of care. The district court could reasonably conclude that admitting the DOPL Petition would "suggest decision on an improper basis" by masking the untested allegation as a finding by DOPL. *See id.* (quotation simplified). And as Gutzman noted prior to trial, combatting such an assumption would require a trial within a trial to explain the difference between an administrative proceeding initiated by DOPL and a judicial action, to say nothing of the difference between a stipulated resolution and an administrative determination following an evidentiary hearing.

¶49    Based on the foregoing, the district court did not abuse its discretion when it excluded the DOPL Petition from evidence at trial.[5]

---

5. Robert further contends that even if the district court properly excluded the DOPL Petition under rule 403, it was nevertheless an abuse of the court's discretion to prohibit Colley from consulting or relying upon the DOPL Petition to formulate his expert opinion. Specifically, Robert posits that the court's blanket prohibition prevented Colley from testifying that Gutzman's actions "violated the standard of care as established by DOPL." But this argument again conflates the import of the allegations in the DOPL Petition. At no point did DOPL ever conclude that

(continued…)

## II. Expert Testimony

¶50 Next, Robert argues the district court abused its discretion when it admitted certain portions of Keller's testimony over Robert's objection. Specifically, Robert contends the court allowed testimony from Keller that was (1) outside the scope of Keller's expertise and (2) speculative. We address each objection in turn.

A.     Scope of Expertise

¶51 At trial, defense counsel asked Keller his opinion on "whether or not [Gutzman] should have initially suspected an aspirated gauze." Robert objected to the question on the basis that it went to "the standard of care," which was beyond the scope of Keller's expertise. The district court overruled the objection. Keller then testified that Gutzman "wouldn't have been able to know" that Jared aspirated gauze. Robert contends the court should not have admitted this testimony because Keller "was not qualified to opine on the standard of care for an anesthesiologist obligated to protect the airway of a patient undergoing a dental procedure that required unconscious deep sedation." This argument misses the mark.

¶52 "In Utah, a practitioner of one school of medicine is ordinarily not competent to testify as an expert in a malpractice action against a practitioner of another school due to the wide variation between schools in both precepts and practices." *Sprague v. Avalon Care Center*, 2019 UT App 107, ¶ 29, 446 P.3d 132 (quotation simplified). However, "an exception to this rule is

_____

Gutzman's actions fell below the standard of care. Rather, the only finding actually admitted on this point came in through the Stipulation, wherein Gutzman agreed with DOPL that his actions "may be considered unprofessional conduct."

when an expert is knowledgeable about the applicable standard of care." *Id.* (quotation simplified).

¶53    Under rule 702(a) of the Utah Rules of Evidence, the district court must "consider whether expert testimony is necessary to assist the trier of fact and whether the proposed expert has the necessary 'knowledge, skill, experience, training, or education' to provide such assistance to the trier of fact." *Eskelson ex rel. Eskelson v. Davis Hosp. & Med. Center*, 2010 UT 59, ¶ 9, 242 P.3d 762 (quoting Utah R. Evid. 702(a)). The court is given wide discretion under this rule "to determine the admissibility of expert testimony, and to determine if the expert witness is qualified to give an opinion on a particular matter." *Dikeou v. Osborn*, 881 P.2d 943, 947 (Utah Ct. App. 1994) (quotation simplified). We "will not reverse that determination on appeal in the absence of a clear showing of abuse." *Robb v. Anderton*, 863 P.2d 1322, 1326 (Utah Ct. App. 1993) (quotation simplified).

¶54    Here, it is undisputed that Keller was not licensed to perform deep sedation. But the issue in this case did not concern Gutzman's administration of general anesthesia. Rather, the issue was what occurred *after* Blume had completed Jared's dental work and Gutzman had stopped giving Jared sedation medication—or, put differently, once Jared was moderately sedated and in the recovery period.

¶55    Keller testified extensively about his qualifications and experience performing moderate sedation. And Keller's opinions—including whether Gutzman should have suspected that Jared aspirated gauze—were based on only the events that occurred when Jared was in a moderately sedated state. Indeed, Keller explained that at the time Jared aspirated the gauze, he was coughing, moving around, and choking, which are "deliberate movements" that are not present when a patient is deeply sedated. Thus, because Keller was opining on an issue that was squarely within his scope of expertise, we cannot say it was an

abuse of discretion for the court to admit this portion of Keller's challenged testimony.

B.    Speculative Testimony

¶56    During Keller's testimony, defense counsel asked, "[W]hat is your understanding [of] who placed [the] gauze [that Jared aspirated]?" Keller responded, "It would have been either [Blume] or [Underwood], the assistant." Robert objected on the ground that the question called for speculation since Keller "has no idea who placed the gauze." The district court overruled the objection because that statement was "in the deposition testimony" of Keller. Robert contends this was an abuse of the court's discretion because "whether or not [Keller] discussed this point in his deposition had nothing to do with whether the testimony was too speculative to allow its admission."

¶57    To be admissible, expert testimony must be "reliable," "based upon sufficient facts or data," and the opinions must be "reliably applied to the facts." Utah R. Evid. 702(b). The party wishing to rely on the expert's testimony must make a "threshold showing" on each point. *See id.* That threshold requires "only a basic foundational showing" of reliability, and it does not require that "the opinion is indisputably correct." Utah R. Evid. 702 advisory committee's notes. "Indeed, we allow experts latitude to interpret the facts before them." *Eskelson*, 2010 UT 59, ¶ 16. "Although an expert cannot give opinion testimony that flies in the face of uncontroverted physical facts also in evidence, an expert can rely on his own interpretation of facts that have a foundation in the evidence, even if those facts are in dispute." *Id.* (quotation simplified).

¶58    Keller's testimony was sufficient to satisfy the threshold showing required to qualify for admission under rule 702(b). As noted, Keller was admitted as an expert based on his experience as a general dentist administering moderate sedation. And Keller

explained at trial that the opinions provided in his deposition were based on his review of Jared's medical records and the depositions of, among other experts, Gutzman and Blume. Importantly, both Gutzman and Blume had testified that Gutzman removed the throat pack prior to Blume placing gauze at the extraction sites. Based on the timing of Jared's respiratory distress, i.e., that it occurred after the throat pack was removed and while Jared was moderately sedated and in the "recovery phase," Keller concluded that Gutzman did not place the gauze Jared aspirated. Thus, Keller's opinion was expressly based on the application of his "specialized knowledge" dealing with patients in the recovery period to the testimony provided by Gutzman and Blume, which were "the facts in evidence." *See id.* ¶ 19. As a result, the district court did not abuse its discretion in admitting this testimony.

### III. Post-Judgment Motion

¶59 Lastly, Robert argues the district court should have granted his motion for judgment as a matter of law or, in the alternative, for a new trial. We disagree and accordingly affirm the court's denial of this motion.

### A. Motion for Judgment as a Matter of Law

¶60 In a post-trial motion, Robert asked the district court to grant judgment as a matter of law on his medical malpractice claim because he had established that Gutzman was negligent under the principle of res ipsa loquitur and the evidence was "so strong as to compel a finding of negligence." The court denied the motion, reasoning that (1) res ipsa loquitur "provides only for a permissive inference rather than a presumption of negligence, which the finder of fact may choose to reject" and (2) "ample evidence supports the jury's verdict that [Gutzman] did not breach the standard of care." The court was correct in both regards.

¶61    Rule 50 of the Utah Rules of Civil Procedure permits a district court to grant judgment as a matter of law only where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" on a claim or defense. Utah R. Civ. P. 50(a)(1). When considering a rule 50 motion, the "court must look at the evidence and all reasonable inferences in a light most favorable to the nonmoving party." *Franklin v. Stevenson*, 1999 UT 61, ¶ 6, 987 P.2d 22. "We will affirm the denial of a motion for judgment as a matter of law when a review of the evidence in a light most favorable to the non-moving party demonstrates that reasonable minds could disagree with the ground asserted for the motion." *Accesslex Inst. v. Philpot*, 2023 UT App 21, ¶ 34, 526 P.3d 1282 (quotation simplified).

¶62    "In a medical malpractice action, the plaintiff must establish that the physician performed below the applicable standard of care, proximately causing injury to the plaintiff." *Pete v. Youngblood*, 2006 UT App 303, ¶ 20, 141 P.3d 629. As a general rule, "the standard of care and the defendant's breach of that standard must be established through expert testimony." *Id.* "Res ipsa loquitur is an exception to the general rule." *Dalley v. Utah Valley Reg'l Med. Center*, 791 P.2d 193, 196 (Utah 1990).

¶63    "Res ipsa loquitur is essentially an evidentiary rule that allows an inference of negligence to be drawn when human experience provides a reasonable basis for concluding that an injury probably would not have happened if due care had been exercised." *King v. Searle Pharms., Inc.*, 832 P.2d 858, 861 (Utah 1992). To invoke the doctrine, the plaintiff must establish

> (1) the accident was of a kind which in the ordinary course of events, would not have happened had the defendant[] used due care, (2) the instrument or thing causing the injury was at the time of the accident under the management and control of the defendant, and (3) the accident happened

> irrespective of any participation at the time by the plaintiff.

*Youngblood*, 2006 UT App 303, ¶ 22 (quotation simplified). A plaintiff who makes a prima facie showing of these elements is "entitled to a *rebuttable inference* of negligence under the doctrine of res ipsa loquitur." *Id.* ¶ 24 (emphasis added) (quotation simplified); *see also Stevens-Salt Lake City, Inc. v. Wong*, 259 P.2d 586, 588 (Utah 1953) ("The doctrine of res ipsa loquitur merely allows an inference of negligence from the happening of the accident."); *cf. Ballow v. Monroe*, 699 P.2d 719, 723 (Utah 1985) ("Res ipsa does not establish a presumption, either rebuttable or irrebuttable." (quotation simplified)). Ultimately, however, "it is the province of the fact finder (the jury or the court where no jury is sitting) to draw or to reject such inference." *Loos v. Mountain Fuel Supply Co.*, 108 P.2d 254, 258 (Utah 1940) (citing *Zoccolillo v. Oregon Short Line R.R. Co.*, 177 P. 201 (Utah 1918)).

¶64 Here, the bulk of Robert's complaint with the district court's decision to not grant judgment as a matter of law concerns the court's application of res ipsa loquitur. In essence, it is Robert's position that the doctrine of res ipsa loquitur compels a finding of strict liability against Gutzman. But as explained above, this position is simply not supported by Utah law. Instead, our jurisprudence is replete with decisions holding the exact opposite. That is, several decisions show that even where a plaintiff makes a prima facie case for res ipsa loquitur, the plaintiff is not entitled to judgment as a matter of law because res ipsa loquitur "establishes only an *inference* of negligence which the trier of fact may accept or reject." *Ballow*, 699 P.2d at 723 (emphasis added); *see also id.* (explaining that the jury instructions, which "directed the jury to find for the plaintiff if the requisite elements of res ipsa were proved," incorrectly stated the law (quotation simplified)). To credit Robert's position on this point would require us to

depart from over a hundred years of caselaw.[6] This we will not do.

¶65   Moreover, viewing the evidence in a light most favorable to Gutzman as we must, we agree with the district court that "ample evidence supports the jury's verdict." As the court explained in its written decision denying Robert's motion, the "uncontroverted testimony at trial" established that the gauze Jared aspirated was placed by Blume or Underwood, not Gutzman, and that Jared began choking on the gauze only after Gutzman stopped administrating anesthesia. In addition, Gutzman testified that he "[a]bsolutely" maintained the standard

---

6. Indeed, Robert's argument is based primarily on language from *Simmons v. Neuman*, 855 N.Y.S.2d 189 (App. Div. 2008), a non-binding slip opinion issued by an intermediate appellate court in New York. *See id.* at 190 (stating that res ipsa loquitur may support a directed verdict "only when the plaintiff's circumstantial proof is so convincing and the defendant's response so weak that the inference of [the] defendant's negligence is inescapable" (quotation simplified)). But in selectively quoting language from this case, Robert conveniently ignores the fact that the *Simmons* court declined to grant the plaintiff the relief which Robert now seeks. *Id.* The court instead upheld the trial court's decision to deny summary judgment on the issue of liability pursuant to the doctrine of res ipsa loquitur, reasoning that "since the doctrine concerns circumstantial evidence which allows, *but does not require*, the fact finder to infer that the defendant was negligent, *res ipsa loquitur evidence does not ordinarily or automatically entitle the plaintiff to summary judgment or a directed verdict, even if the plaintiff's circumstantial evidence is unrefuted*." *Id.* (emphasis added) (quotation simplified). And as illustrated, *see supra* ¶ 63, all the Utah cases cited by Robert reject his position outright. *See Ballow v. Monroe*, 699 P.2d 719, 723 (Utah 1985); *Stevens-Salt Lake City, Inc. v. Wong*, 259 P.2d 586, 587–88 (Utah 1953); *Zoccolillo v. Oregon Short Line R.R. Co.*, 177 P. 201, 210 (Utah 1918).

of care during the procedure, and expert testimony corroborated Gutzman's account of the events. Based on these facts, the jury could have reasonably concluded that the gauze Jared aspirated had been placed by either Blume or Underwood and that the individual who placed the gauze (either Blume or Underwood) was responsible for ensuring that Jared did not choke on it. As such, the court correctly denied Robert's motion for judgment as a matter of law.

### B. Motion for a New Trial

¶66 Robert argues the district court further erred in denying his motion for a new trial because the evidence was insufficient to support the jury's verdict that Gutzman complied with the standard of care. We disagree.

¶67 Under rule 59(a)(6) of the Utah Rules of Civil Procedure, a district court may grant a new trial when the evidence is insufficient to justify the verdict. Because "the district judge who presided over a trial is in a far better position than an appellate court to determine . . . whether the evidence was sufficient to justify the verdict," appellate review of such decisions is "quite limited." *ASC Utah, Inc. v. Wolf Mountain Resorts, LC*, 2013 UT 24, ¶¶ 21–22, 309 P.3d 201 (quotation simplified); *accord USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 31, 372 P.3d 629. "A party claiming that the evidence does not support a jury's verdict carries a heavy burden." *Jessop v. Hardman*, 2014 UT App 28, ¶ 10, 319 P.3d 790 (quotation simplified). To satisfy this burden, the party challenging the verdict must show that "viewing the evidence in the light most supportive of the verdict, . . . the evidence . . . was completely lacking or was so slight and unconvincing as to make the verdict plainly unreasonable and unjust." *Id.* ¶ 13 (quotation simplified).

¶68 The district court denied Robert's motion for a new trial for the same reason that it denied his motion for judgment as a matter

of law—that is, because "ample evidence supports the jury's verdict that [Gutzman] did not breach the standard of care." Viewed in the light most favorable to the verdict, we conclude that the evidence discussed above was sufficient to support the jury's verdict. *See supra* ¶ 65. The evidence showed that the gauze that Jared aspirated was placed by Blume or Underwood, not Gutzman, and the jury could therefore have reasonably concluded that Gutzman was not in control of that gauze.

¶69 Notwithstanding this evidence, Robert contends he was entitled to a finding in his favor because Colley offered "unrebutted expert testimony" that Gutzman's treatment of Jared fell below the applicable standard of care. But this position undermines a key principle of our justice system, that "the jury is entrusted to resolve all relevant questions of fact presented to the court," including "findings of negligence, apportionment of fault, witness credibility and the weight and inferences to be drawn from the evidence." *Moa v. Edwards*, 2011 UT App 140, ¶ 6, 256 P.3d 242 (quotation simplified), *cert. denied*, 262 P.3d 1187 (Utah 2011). To that end, juries are given an "extraordinarily broad" latitude to weigh the credibility of witnesses, and that "latitude is even broader" when assessing expert testimony. *Lyon v. Bryan*, 2011 UT App 256, ¶ 10, 262 P.3d 1199. And "a jury is free to disregard expert testimony in whole or in part." *State v. Carter*, 707 P.2d 656, 663 (Utah 1985). Even where an "expert's opinion is unchallenged by the opinion of an opposing expert," the jury "is not required to believe [that] expert." *Lyon*, 2011 UT App 256, ¶ 10; *see also DeBry v. Cascade Enters.*, 879 P.2d 1353, 1360 (Utah 1994) ("[T]he jury was not bound under the law to accept the plaintiffs' evidence . . . or even to view that evidence in the light most favorable to the plaintiffs' case."). Thus, even if Colley's testimony was unrebutted, the jury was not required to simply accept it wholesale. "Rather, it was the jury's prerogative to probe, test, weigh, and evaluate any evidence presented, including the testimony of expert witnesses." *Lyon*, 2011 UT App 256, ¶ 11.

¶70    The district court did not abuse its discretion by denying Robert's motion for a new trial. The jury's verdict was supported by substantial evidence. And even though Colley's testimony was unrebutted, Robert is not entitled to a finding in his favor on this basis because the jury was not obligated to accept Colley's testimony as true.

## CONCLUSION

¶71    The district court did not abuse its discretion when it excluded the DOPL Petition from evidence at trial or when it overruled objections to Keller's expert testimony. And the district court's decision to deny Robert's post-trial motion was proper.

¶72    Affirmed.

——————