**2025 UT App 137**

# THE UTAH COURT OF APPEALS

MIR MARRI,
Appellant,
*v.*
RABIA RIZWAN,
Appellee.

Opinion
No. 20230034-CA
Filed September 18, 2025

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 214902843

Russell Yauney, Attorney for Appellant

Emily Adams and Sara Pfrommer,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and AMY J. OLIVER
concurred.

LUTHY, Judge:

¶1     Rabia Rizwan agreed to enter into an arranged marriage with Mir Marri. Marri later filed for divorce, and Rizwan counterclaimed for annulment on the grounds of common law fraud. The trial court held a bench trial and issued an annulment. It found that Marri had (1) misrepresented that he was legally divorced from his first wife, that he had no children from that marriage, and that he held a master's degree and (2) withheld information that should have been disclosed—namely, his sexual attraction to men, which Rizwan alleged prevented the couple from having a healthy sexual relationship. The court determined that the misrepresentations and the withheld information directly

affected the marriage relationship and that without them Rizwan would not have agreed to marry Marri.

¶2    Marri appeals, contending that the court acted improperly in admitting certain evidence, granting the annulment, denying Marri's motion for a new trial, and calculating Marri's child support arrears. We find none of these arguments persuasive, and we affirm.

BACKGROUND[1]

*The Marriage*

¶3    Rizwan is a Pakistani American and a practicing Muslim. Prior to the events of this case, she had been married once and was divorced, and she had a son from that marriage. She was interested in remarrying, and because of the difficulties in her culture associated with marrying after divorce, she sought assistance from her brother (Brother), with whom she lived, and a marriage broker.

¶4    The broker sent Rizwan and Brother a profile of Marri, a Pakistani Muslim man. Rizwan spoke with Marri and his mother through the video and text messaging app WhatsApp. Marri represented that he held both a bachelor's degree and a master's degree that he had obtained while living in the United Kingdom with his first wife. Marri claimed he was employed as a branch manager for a bank, and both he and his mother represented that he owned his home in Pakistan. Marri claimed to have no children from his previous marriage. And he indicated that he was legally

---

1. "On appeal from a bench trial, we view and recite the evidence in the light most favorable to the trial court's findings; we present additional evidence only as necessary to understand the issues on appeal." *Bountiful City v. Sisch*, 2023 UT App 141, n.1, 540 P.3d 1164 (cleaned up).

divorced from his first wife. Ultimately, Marri provided an offer of marriage to Rizwan.

¶5 While Rizwan and Brother considered Marri's offer, they also considered a marriage offer from another Pakistani Muslim man. This man was very educated and had a "good job." Given Marri's purported similar qualities in terms of education and financial stability, Rizwan and Brother decided to proceed with the match with Marri because the other man had a child from a previous relationship and was older than Marri.

¶6 Rizwan accepted Marri's marriage proposal, and she traveled to Pakistan to be married in November 2017. Marri continued living in Pakistan after the marriage, and Rizwan returned to the United States. Rizwan later visited Marri in Pakistan during the spring of 2018, and after returning to the United States, she gave birth to the couple's daughter in February 2019. Marri remained in Pakistan awaiting approval of a visa to enter the United States.

¶7 In November 2019, Marri received his visa, and he came to the United States the following month and moved into Brother's home with Rizwan, the couple's daughter, Rizwan's son, and Brother. In March 2020, Marri was criminally charged in connection with a domestic violence incident against Rizwan. After ongoing difficulties, the parties separated in March 2021.

*The Initiation of Divorce and Annulment Proceedings*

¶8 In May 2021, Marri filed for divorce, and Rizwan filed a counterclaim for annulment. In her counterclaim, Rizwan alleged that Marri had failed to disclose or had misrepresented various facts, including that he is sexually attracted to men; that he did not intend to engage in a "healthy, regular and routine sexual and physical relationship" with Rizwan; that he had a child from his previous marriage; that he "physically abused and emotionally maltreated his first wife"; that he did not intend to support

Rizwan financially or in other ways; and that he did not love Rizwan, as he claimed, but married her only to receive a green card. Rizwan also stated that Marri "misrepresented the facts about his . . . prior marriage [and] divorce." Rizwan asserted that she relied on Marri's false representations to her detriment and that these issues went to the "fundamental elements" of marriage, thereby providing grounds for annulling the couple's marriage.

¶9     The case proceeded to a two-day bench trial, during which the court heard testimony from Rizwan, Brother, Marri's first wife, an expert on immigration fraud (Expert), and Marri.

*Rizwan's Testimony*

¶10     Rizwan testified that she spoke to Marri and his mother on WhatsApp twice before going to Pakistan to be married. She said that Marri told her he had a master's degree from a university in the United Kingdom. She also said that he sent her a copy of a diploma through WhatsApp before the wedding and showed her the same diploma when she arrived in Pakistan. The diploma, which was not genuine (Marri admitted at trial that he had no master's degree), was admitted into evidence. Rizwan testified that if she had known Marri was providing false information about his education, she would not have married him. Rizwan also stated that Marri's representation that he was employed as a bank branch manager was false.

¶11     Rizwan testified that she provided Marri a copy of her divorce certificate prior to their marriage and that she asked many times for a copy of Marri's divorce certificate but that he said he did not have a copy.

¶12     Rizwan also testified that she learned in March 2021 that Marri had a child with his first wife. Prior to that time, he had never told Rizwan about the child. Rizwan said she would not have married Marri if she had known about his previous child,

explaining that in choosing to remarry, one of her conditions was that her spouse not already have children.

¶13    She testified that approximately twenty times while Marri lived with her, she saw pornography on Marri's phone or computer depicting sexual interactions between men. Rizwan introduced an exhibit consisting of a list of websites and login credentials, which she claimed to have found in Marri's room when visiting Pakistan in 2018.[2] She did not investigate the sites until after Marri filed for divorce, but at that time she discovered that the list pertained to websites geared toward same-sex relationships. Rizwan also testified that Marri had the Grindr app on his phone and that she later discovered that this is a gay dating app.[3] Rizwan never saw Marri engage in sexual relations with men, but she once saw a man lying on Marri's lap at Brother's home.

¶14    Rizwan believed Marri's attraction to men prevented him from having a healthy sexual relationship with her. She reported that Marri demanded his own bedroom and showed her no physical affection, even calling her a "sexaholic" for putting her arms around him. She claimed the couple had sexual intercourse only three times during the marriage.

*Brother's Testimony*

¶15    Brother corroborated Rizwan's testimony that, prior to the marriage, Marri represented that he had studied in the United

---

2. Marri takes issue with the characterization of the list as containing multiple websites, arguing that there was only one URL on the list. The list is not in the appellate record, so we cannot address this concern.

3. Grindr describes itself as "the world's largest network for gay, bi, trans, and queer adults." *About*, Grindr, https://grindr.com /about [https://perma.cc/RDL9-UUDF].

Kingdom and obtained both a bachelor's and a master's degree. Brother agreed that Marri had claimed to be financially stable and to own property in Pakistan, which he said he would sell when he moved to the United States so he could buy a home here. Brother stated that Marri's purported educational and financial status were the chief reasons that he and Rizwan decided to accept Marri's marriage offer.

¶16 Brother testified that, as described above, *see supra* ¶ 5, Rizwan had received a marriage offer from another Pakistani Muslim man but that, despite that man being well-educated and favorably employed, they did not accept his offer because he had a child and was "a little bit older." Brother agreed with Rizwan that Marri represented that he had no previous children. Brother testified that when Marri was asked why he did not have children from his previous marriage, he repeatedly stated that his first wife had been a model and did not want to "destroy her figure" by having children. Brother explained that Marri's lack of children was an important consideration because it would make the transition easier for Rizwan's son from her previous marriage. Brother said that Marri avowed before the marriage that he would take care of Rizwan's son, provide for him financially, and raise him as if he were Marri's own. But Brother testified that when Marri eventually moved into Brother's house, Marri repeatedly grabbed the son by the neck, pinched him on his wrist, and pulled on his ears.

*Marri's First Wife's Testimony*

¶17 When Rizwan's counsel called Marri's first wife to testify, Marri's counsel objected that she had not been timely disclosed as a witness. The court reserved ruling on that issue.

¶18 Marri's first wife testified that Marri was the father of their daughter. She testified that she married Marri in 2008 and that the pair separated in 2012 but did not then divorce. She indicated that, thereafter, the pair obtained only a religious divorce. The court

asked about a divorce certificate issued in January 2018, and she stated that she never received notice of a divorce from Marri.

¶19    Further, she testified that while she lived with Marri, she witnessed him acknowledge to his mother that he was gay. She said that she observed him accessing gay pornography on his computer and that she saw him watching gay pornography movies ten to twelve times. She also stated that he had an account on a website called Manjam.[4]

*Expert's Testimony*

¶20    Rizwan called Expert, an expert on immigration and marriage fraud. Marri objected as to Expert's qualifications, arguing that his experience with federal investigations of immigration and marriage fraud did not qualify him in this case because he was unfamiliar with Utah law. The court determined that Expert was qualified and allowed him to testify. Expert then testified that after reviewing the documents and facts provided to him, it was his opinion that Marri had "engaged in marriage fraud in order to obtain permanent residen[t] status in the United States."

¶21    Expert was particularly suspicious of the divorce certificate Marri provided from his first marriage. The certificate stated that the effective date of the divorce was January 2017, but the issuance date was January 2018. Expert pointed out that the document did not exist in November 2017, when Marri and Rizwan married. Expert stated, "So at the time [Rizwan] and [Marri] got married, there was no divorce." Expert also noted that the document contained the word "Talaq" and that his research suggested that

_____

4. "Manjam was a social networking website that used GPS technology and social discovery to connect mutually attracted gay and bisexual men. . . . The site was active from 2004 to 2016, when it shut down." *Manjam.com*, Wikipedia, https://en.wikipedia.org/wiki/Manjam.com [https://perma.cc/78BQ-FHE4].

this word related to "a religious divorce under Sharia Law" rather than to a legal divorce. Further, Expert indicated that the document's lack of mention of the couple's daughter and its lack of a Hague Convention Apostille made it suspicious.

¶22    Expert highlighted other facts upon which he based his opinion that Marri's agreement to marry Rizwan was a pretext, including that Marri waited to move to the United States until after a deadline had passed that would have required the couple to prove "that the marriage [was] viable" and that the parties had "established a life together"; that Marri failed to include his daughter from his first marriage on his immigration paperwork; and that Marri listed his status as single on his first United States tax return, not as married filing separately.

*Marri's Testimony*

¶23    Marri also testified. He agreed that the marriage was arranged, though he asserted that Rizwan did not list any specific requirements for a spouse. He contended that he and Rizwan communicated daily on WhatsApp for several months before the wedding.

¶24    He declared that he had not claimed to have a master's degree and that he did not recognize the fake diploma or know its origins.

¶25    Marri asserted that he had told Rizwan about his daughter from his first marriage before he and Rizwan married. He said he had explained to her that he had not had contact with his daughter for roughly a decade because his first wife and her family prevented him from contacting her and replaced him as her father with an uncle, telling her that her father had died. Marri explained that he had not had contact with his first wife since 2014, but he said she could have contacted him if she had wanted to because they had relatives who were connected. He stated that he did not report his daughter on his immigration paperwork

because he had no documents for the child and Rizwan did not want the hassle of taking care of someone else's child. When shown a text message Rizwan sent him after they married in which she asked if he had any other children besides their daughter, Marri acknowledged that he had, at that time, denied having other children.

¶26    Marri disagreed that he and Rizwan had only had sex three times, insisting that they had sex multiple times per week. He claimed that he slept in a separate room only because Rizwan's son, who shared her room, did not want him in the room. Marri denied ever watching gay pornography in Utah. He testified that he was unfamiliar with the websites on the list Rizwan had purportedly found. And he said he did not know how she obtained the list.

¶27    The court asked about Marri's income for purposes of child support and potential alimony, and Marri's counsel proffered that Marri earned $26.52 per hour and was scheduled to work thirty-six hours per week. The court asked if Marri would object to imputing his income based on a forty-hour work week, and counsel replied, "I certainly hope that the same courtesy be shown him, but I will agree, Your Honor." The court responded, "Well, absolutely. They're [both] entitled to [the principle that] you have to have a full-time job."

*The Court's Order*

¶28    After the trial, the court issued a written order granting Rizwan's counterclaim for an annulment. In addressing Rizwan's request for an annulment, the court first reviewed the legal standard set forth in *Haacke v. Glenn*, 814 P.2d 1157, 1158–59 (Utah Ct. App. 1991), for using fraud as a basis for annulment.

¶29    The court then noted Expert's opinion that Marri married Rizwan "to obtain an immigration benefit," and it stated that it found credible "[t]he basis and reasoning provided by [Expert]."

The court stated, however, that it ultimately "[did] not make a determination on this issue."

¶30    The court found that Marri obtained a religious divorce from his first wife but that the divorce certificate Marri ultimately provided was created after his marriage to Rizwan. The court further stated, "There is evidence [Marri] is still married to his first wife, never having obtained a legal divorce at the time he married [Rizwan]."

¶31    The court then made the following findings:

> In [weighing] the testimony and credibility of the parties and the witnesses called, the [c]ourt finds [Marri's] testimony not as creditable when compared to the other witnesses. In addition, several times the evidence had shown [Marri's] testimony was not believable, in particular [Marri's] education and having a Master's degree in business administration at a college in the United Kingdom and providing of education certificates; not disclosing about having a child from his first marriage; about watching gay pornography during the marriage and frequenting websites of the similar nature. After their marriage, [Rizwan] found some evidence by way of gay pornographic websites and [Marri's] viewing of homosexual movies.

¶32    Based on these findings, the court granted Rizwan an annulment "on the grounds of fraud that directly affected their marriage relationship, based upon facts at that time which were affirmative false representations and based upon facts that were withheld and should have been disclosed." The court determined that "[t]hese false representations and facts which were withheld were to such a degree that if [Rizwan] had known she would have not consented to and entered into the marriage."

¶33    The court also ordered Marri to pay child support, and it determined that he already owed Rizwan child support from April 2021 (the first full month of the parties' separation) through December 2022 (the month in which the trial concluded). For both the ongoing and retroactive child support, the court imposed a rate of $542 per month, which was based on a gross monthly income for Marri of $4,596.80, calculated by multiplying Marri's wage of $26.52 per hour by forty hours per week. The court used a twenty-hour work week for calculating Rizwan's income, explaining that it was "not going to impute income to [Rizwan] for a full-time (40) hour work week [because] the parties' minor child is not school age and day care expenses would offset the additional income." The court subtracted the amount of child support Marri had voluntarily given Rizwan over the indicated months, finding that Marri still owed Rizwan $5,839.

*Marri's Post-trial Motion*

¶34    After the court entered its order, Marri filed a Motion for Supplemental Findings or, In the Alternative, a New Trial. As to the request for supplemental findings, Marri argued that the court's order contained no findings addressing the nine elements of fraud and that it was not clear from the court's order what standard of proof the court had applied. Marri based his request for a new trial on, among other things, an assertion of surprise— namely, that Rizwan's evidence that Marri was not legally divorced from his first wife when he married Rizwan constituted a new claim that Rizwan had not previously raised.

¶35    The court denied Marri's motion. It reviewed the potential grounds for a new trial under rule 59 of the Utah Rules of Civil Procedure and concluded that none of them applied. Regarding the adequacy of its findings, the court then stated:

> As mentioned in the hearing, the court did not want [Marri] to be deported from the country and be deprived of his parental right to be with his child or

[Rizwan to] not receive child support because [Marri] was not in the country. The [c]ourt did not and does not want its ruling to have any influence or impact upon or be determinative on any possible future immigration issues or be utilized in other legal proceedings, and therefore the [c]ourt was as minimal as possible with its ruling and intentionally did not state the standard [of proof] is clear and convincing [evidence], despite both counsel and the [c]ourt knowing that was the standard as was discussed at trial. The [c]ourt does not see how it helps [Marri] [meet] the above objectives to have every single thing determined by the [c]ourt against him listed and detailed in an opinion. Respectfully[,] [the] [c]ourt denies the Motion under Rule 59 and declines the invitation to supplement findings.

¶36    Marri now appeals.


ISSUES AND STANDARDS OF REVIEW

¶37    On appeal, Marri raises a number of issues for our review.[5] First, he contends that the trial court improperly granted the annulment. We review the court's annulment order for correctness with respect to its interpretation of the law, for clear error with respect to its factual findings, and for abuse of discretion with respect to its application of statutory requirements to factual findings. *See RHN Corp. v. Veibell*, 2004 UT 60, ¶ 22, 96 P.3d 935 ("We review the trial court's conclusions of law . . . for

_____

5. In his opening brief, Marri identifies five issues for review, but he advances eight points in the argument section of the brief. We address Marri's arguments using the organizational framework employed by Rizwan in her brief, sometimes covering more than one of Marri's eight points of argument under a single issue.

correctness, according the trial court no particular deference." (cleaned up)); *id.* ("We will not reverse the findings of fact of a trial court sitting without a jury unless they are clearly erroneous." (cleaned up)); *Taft v. Taft*, 2016 UT App 135, ¶ 63, 379 P.3d 890 ("A challenge that involves a review of the trial court's application of statutory requirements to factual findings is a mixed question of law and fact. . . . The trial court's application of the statute to those findings will not be reversed absent an abuse of discretion." (cleaned up)).

¶38 Second, Marri asserts that the trial court abused its discretion in allowing Expert and Marri's first wife to testify and in admitting the fake master's degree diploma and the list of websites geared toward same-sex relationships along with the associated login credentials. "We review for correctness any legal questions underlying the admissibility of evidence, but we review for abuse of discretion any decisions to admit or exclude evidence and determinations regarding the admissibility of expert testimony." *Metropolitan Water Dist. v. Sorf*, 2023 UT App 146, ¶ 28, 542 P.3d 87 (cleaned up), *cert. denied*, 550 P.3d 992 (Utah 2024).

¶39 Third, Marri argues that the trial court abused its discretion in refusing to grant his motion for a new trial on the basis of surprise. "[B]oth the granting of, and the refusing to grant, a new trial is a matter left to the discretion of the trial judge, and that decision will be reversed only if the judge has abused that discretion by acting unreasonably." *Christenson v. Jewkes*, 761 P.2d 1375, 1377 (Utah 1988).

¶40 Fourth, Marri contends that the trial court inaccurately calculated the retroactive child support award. "Because district courts have broad discretion to award child support, we will not disturb such decisions absent an abuse of discretion." *Burggraaf v. Burggraaf*, 2019 UT App 195, ¶ 24, 455 P.3d 1071 (cleaned up).

ANALYSIS

I. The Annulment

¶41 Marri first argues that the trial court erred in granting an annulment. He takes issue with both the adequacy of the court's findings and the sufficiency of the evidence supporting those findings. He also contends that, in any event, the fraud found by the trial court was not of a kind that supported the granting of an annulment. We address each of his contentions in turn.

A.    Adequacy of the Findings

¶42 "Under Utah law, there is a distinction between a challenge to the sufficiency of the evidence, which asserts that there was insufficient evidentiary support for a particular factual finding, and a challenge to the adequacy of the court's findings, which asserts that the court's findings did not adequately explain the basis for the court's rulings." *Mortensen v. Mortensen*, 2025 UT App 8, ¶ 34, 564 P.3d 508 (cleaned up), *cert. denied*, 570 P.3d 659 (Utah 2025).

¶43 Marri challenges the adequacy of the trial court's findings, but he fails to provide any meaningful analysis to support his challenge. He acknowledges that "unstated findings can be implied if it is reasonable to assume that the trial court actually considered the controverted evidence and necessarily made a finding to resolve the controversy." *Fish v. Fish*, 2016 UT App 125, ¶ 22, 379 P.3d 882 (cleaned up). And he observes that, in contrast, missing findings will not be implied "where there is a matrix of possible factual findings and we cannot ascertain the trial court's actual findings." *Hall v. Hall*, 858 P.2d 1018, 1025–26 (Utah Ct. App. 1993) (cleaned up). He then simply asserts, without analysis, that "[t]he court failed to make findings regarding each of the nine elements of fraud." Marri's challenge to the adequacy of the court's findings is inadequately briefed. *See U.S.A. United Staffing All., LLC v. Workers' Comp. Fund*, 2009 UT App 160, ¶ 14, 213 P.3d

20 ("A brief is inadequate if it merely contains bald citations to authority without development of that authority and reasoned analysis based on that authority." (cleaned up)). Therefore, we need not address it. *See Li-Huang Pon v. Brewer*, 2020 UT App 99, ¶ 5 n.1, 468 P.3d 581 (declining to address an inadequately briefed issue).

¶44 Nevertheless, we note that this case does not involve a matrix of possible factual findings from which the trial court's actual findings cannot be ascertained. Instead, because the court granted an annulment expressly based on common law fraud, we can readily ascertain that it found that each element of fraud had been met. Additionally, the court made explicit findings regarding the specific misrepresentations and the withheld information that formed the basis of Marri's fraud. And in its ruling on Marri's post-trial motion, the court explained that it intentionally made the contents of its written order "as minimal as possible" so as to limit the potential impact of its ruling on Marri's immigration status and said that there were unstated findings "determined by the [c]ourt against" Marri that could have otherwise been "listed and detailed." This comment further supports our determination that the court found that each element of fraud was satisfied.

¶45 For the foregoing reasons, we reject Marri's contention that the trial court's findings were inadequate.

B. Sufficiency of the Evidence

¶46 We next consider Marri's argument that there was insufficient evidence to support the court's findings that Marri made affirmative misrepresentations and withheld facts that should have been disclosed.

¶47 Fraud forming the basis for an annulment "may consist of an affirmative false representation or the withholding of the truth when it should be disclosed." *Haacke v. Glenn*, 814 P.2d 1157, 1158

(Utah Ct. App. 1991) (cleaned up). Here, the trial court found that Marri had made misrepresentations and withheld material information. It pointed to Marri's misrepresentation about being divorced from his first wife at the time he married Rizwan, his failure to disclose his sexual attraction to men, his misrepresentation about having no previous children, and his misrepresentation about his level of education. Marri disputes that there was sufficient evidence for the court to make these findings.[6]

¶48    In the tort context, fraud must be shown by clear and convincing evidence. *Armed Forces Ins. Exch. v. Harrison*, 2003 UT 14, ¶¶ 19, 27, 70 P.3d 35. Here, the trial court determined that fraud must be proved by clear and convincing evidence in the annulment context as well. The parties do not challenge that determination, and we therefore assume that the clear and convincing burden of proof applies.[7]

¶49    "Clear and convincing evidence is an intermediate standard of proof that implies something more than the usual requirement of a preponderance of the evidence[] and something less than proof beyond a reasonable doubt. Put differently, this standard requires the existence of facts that make a conclusion very highly probable." *In re K.K.*, 2023 UT App 13, ¶ 22, 525 P.3d

---

6. Marri raises concerns about other purported facts as well, but we limit our discussion to the findings that support the court's determination that Marri committed fraud.

7. While the issue has not been addressed by Utah's appellate courts, the apparently universal consensus among jurisdictions that have addressed the issue is that a party seeking an annulment for fraud must prove the fraud by clear and convincing evidence. *See, e.g.*, *Wisniewski v. Dolecka*, 489 P.3d 724, 727 (Ariz. Ct. App. 2021); *Irving v. Irving*, 134 P.3d 718, 720 (Nev. 2006); *Nwankwo v. Uzodinma*, 185 N.E.3d 513, 519 (Ohio Ct. App. 2022).

519 (cleaned up), *cert. denied*, 531 P.3d 731 (Utah 2023). "An appellate court will reverse a trial court's decision that clear and convincing evidence was presented only if that decision is clearly erroneous." *Lunt v. Lance*, 2008 UT App 192, ¶ 18, 186 P.3d 978. "To qualify as clearly erroneous, a trial court's findings must be either against the clear weight of the evidence or must induce a definite and firm conviction that a mistake has been made." *Id.* (cleaned up).

¶50 While Marri presented evidence—primarily his own testimony—contrary to the court's findings, the court specifically determined that Marri's testimony was "not as creditable when compared to the other witnesses." And on the issue of witness credibility, "we may not substitute our judgment for that of the trial court as trial courts are in a better position to weigh conflicting evidence and evaluate the credibility of witness testimony." *Id.* ¶ 19; *see also Kimball v. Kimball*, 2009 UT App 233, ¶ 20 n.5, 217 P.3d 733 ("No matter what contrary facts might have been found from all the evidence, our deference to the trial court's pre-eminent role as fact-finder requires us to take the findings of fact as our starting point, unless particular findings have been shown . . . to lack legally adequate evidentiary support."). Thus, Marri's pointing to evidence that may have supported contrary findings does not render the court's actual findings clearly erroneous.

¶51 Moreover, there was sufficient evidence to support the court's fraud findings. Specifically, there was sufficient evidence that Marri represented he was legally divorced from his first wife but was not actually so when he married Rizwan. Brother testified that Marri said before he married Rizwan that he was legally divorced from his first wife. Rizwan also testified that Marri claimed to be divorced. Expert testified, however, that he found the divorce certificate from Marri's first marriage highly suspicious. Expert noted the document's issuance date of January 2018, which was after Marri and Rizwan's marriage. Although the

document stated that the effective date of the divorce was January 2017, Expert opined that "at the time [Rizwan] and [Marri] got married, there was no divorce." Expert also noted that the document contained the word "Talaq" and that his research suggested that this word related to "a religious divorce under Sharia Law" rather than to a legal divorce. Further, Expert indicated that the document's lack of mention of the couple's daughter and its lack of a Hague Convention Apostille made the document suspicious. Accordingly, the court had sufficient evidence to find that Marri was not legally divorced at the time he married Rizwan.[8]

¶52    There was also ample evidence that Marri is sexually attracted to men and that he did not disclose this fact to Rizwan before their marriage. Rizwan testified that approximately twenty times while Marri lived with her, she saw pornography depicting sexual interactions between men on Marri's phone or computer. She testified that she found a list of websites geared toward same-sex relationships along with associated login credentials in Marri's room when visiting Pakistan in 2018 and that Marri had the Grindr app on his phone. Furthermore, she stated that she once saw a man lying on Marri's lap at Brother's home. Rizwan's testimony makes the fact that Marri is sexually attracted to men "very highly probable." *See In re K.K.*, 2023 UT App 13, ¶ 22 (cleaned up). Moreover, that Rizwan found the list of websites and login credentials mere months after she married Marri

---

8. In addition to the evidence listed, Marri's first wife testified that after she and Marri separated, they did not obtain a legal divorce. But even without the testimony of Marri's first wife, Expert's, Rizwan's, and Brother's testimony provided sufficient evidence for the court to find that Marri affirmatively misrepresented the status of his first marriage. And in light of our analysis regarding the admissibility of Marri's first wife's testimony, *see infra* ¶¶ 101–05, we do not rely on this evidence in our assessment of the sufficiency of the evidence on this point.

supports the finding that Marri was sexually attracted to men when he married Rizwan and failed to tell her so.[9]

¶53    Additionally, there was sufficient evidence that Marri lied about having no previous children. Brother testified that Marri claimed he had no previous children and explained the lack of children by asserting that his first wife had been a model and did not want to "destroy her figure" by having children. Rizwan testified that she learned in March 2021 that Marri had a child with his first wife. Prior to that time, he had never told Rizwan about the child. Marri did not deny at trial that he was the child's father, so the combined testimony of Rizwan and Brother meet the clear and convincing standard that Marri made an affirmative misrepresentation before marriage by claiming not to have a child.

---

9. Marri's first wife provided testimony on this point as well. But again, the court had sufficient evidence to support its finding—this time of Marri's sexual attraction to men at the time of his marriage to Rizwan—without relying on Marri's first wife's testimony. Marri has not argued that viewing gay pornography, accessing websites geared toward same-sex relationships, and using Grindr are inconsistent with being sexually attracted to men. Instead, he has disputed only the strength of the evidence on this issue, particularly as against Marri's testimony that he did not view gay pornography in Utah. Because the court found Marri less credible than Rizwan on this point, specifically crediting Rizwan's testimony about Marri's use of gay pornography and websites, Rizwan's testimony alone on this subject satisfies the clear and convincing standard that Marri was sexually attracted to men and did not disclose this fact to Rizwan. And again, in light of our analysis regarding the admissibility of Marri's first wife's testimony, *see infra* ¶¶ 101–05, we do not include her testimony in our analysis here.

¶54　Finally, there was sufficient evidence that Marri also misrepresented his level of education prior to the marriage. Rizwan testified that Marri told her he had a master's degree from a university in the United Kingdom. She said that before the wedding he used WhatsApp to send her a copy of a diploma evidencing his receipt of a master's degree and that he showed her the same diploma when she came to Pakistan. Brother likewise testified that, prior to the marriage, Marri represented he had studied in the United Kingdom and obtained both a bachelor's and a master's degree. Marri then admitted at trial that he did not have a master's degree. The combined testimony of Rizwan, Brother, and Marri satisfies the standard of clear and convincing evidence on this point.

¶55　In sum, the trial court's findings as to Marri's misrepresentations and failure to disclose were supported by clear and convincing evidence.

C.　　Whether Annulment was Proper Based on Marri's Fraud

¶56　We next consider Marri's contention that the court erred in concluding that Marri's fraud justified an annulment.

¶57　In Utah, a court may annul a marriage if, at the time of the marriage, either (1) the marriage is statutorily prohibited or void or (2) "upon grounds existing at common law." Utah Code § 81-4-302.[10] "Under common law, a marriage could be annulled for a fraud going to the essence of the marriage." *Haacke v. Glenn*, 814 P.2d 1157, 1158 (Utah Ct. App. 1991).

---

10. This provision was renumbered and amended in 2024. At the time of Rizwan and Marri's marriage, it was codified as Utah Code section 30-1-17.1 (2017). Because the provision has not materially changed, we cite the current version of the code.

¶58    This court has addressed a marriage annulment based on common law fraud only once, in *Haacke*.[11] There, an attorney who worked for the Inspector General's Division of the Utah Department of Corrections married a man who intentionally concealed that he had been convicted of a second-degree felony in another state. *Id.* at 1157. The attorney's employer discovered the conviction and informed the attorney that her employment would be terminated based on the conflict of interest created by her marriage to a convicted felon. *Id.* at 1157–58. The attorney filed for an annulment, but the district court awarded a divorce instead. *Id.* at 1158. On appeal, we considered whether there existed common law grounds for an annulment based on fraud. *Id.*

¶59    We stated that fraud permitting annulment "must be such that directly affects the marriage relationship." *Id.* (citing *Bing Gee v. Chan Lai Yung Gee*, 202 P.2d 360, 364 (Cal. Dist. Ct. App. 1949)). We explained that "[t]he misrepresentation must go to present and not future facts." *Id.* (citing *Wolfe v. Wolfe*, 378 N.E.2d 1181, 1184 (Ill. App. Ct. 1978)). We also said that "the fraud must be material to such a degree that, had the deceived party known of the fraud, he or she would not have consented to the marriage." *Id.* (citing *Avnery v. Avnery*, 375 N.Y.S.2d 888, 890 (App. Div. 1975)). "The test in all cases," we concluded, "is whether the false representations or concealment were such as to defeat the essential purpose of the injured spouse inherent in the contracting of a marriage." *Id.* (quoting *Douglass v. Douglass*, 307 P.2d 674, 675 (Cal. Dist. Ct. App. 1957)).

¶60    We also explained that the standard for assessing fraud is a subjective one that takes into account "the facts of the particular

---

11. The Utah Supreme Court has addressed the annulment of a marriage based on common law fraud twice. *See Holder v. Holder*, 340 P.2d 761 (Utah 1959); *Bement v. Bement*, 174 P.2d 996 (Utah 1946). But the opinions in those cases do not assist our resolution of the issues in this case.

marriage." *Id.* And we said that in a particular case, "justice may demand that an annulment be granted even though there is no [other] case with the same set of specific facts" and even though "the grounds pleaded for annulment could also constitute grounds for divorce." *Id.* at 1159.

¶61　We then considered the facts of *Haacke*. We reasoned that "[n]ot only did [the man's] fraudulent misrepresentation affect [the attorney's] career, but, more importantly, it defeated the essential purpose of the injured spouse inherent in the contracting of a marriage," which was "to have a home, a husband of honorable character whom she could respect and trust, one whom she would be proud to have as a companion and to introduce to her friends, and who would be a suitable father for her children." *Id.* (cleaned up). Accordingly, we determined that the man's "false representations and concealments . . . so violated the essential purpose of the marriage, that [the attorney was] entitled to an annulment." *Id.*

¶62　Here, the trial court similarly determined that Marri's misrepresentations and withheld information "directly affected [Rizwan and Marri's] marriage relationship" and that "[t]hese false representations and facts which were withheld were to such a degree that if [Rizwan] had known she would not have consented to enter into the marriage." In conducting this analysis, the court applied the correct legal standard—as set forth in *Haacke*—by conducting a subjective assessment of whether Rizwan would have agreed to marry Marri had he not made false representations and withheld the truth. We conclude that the trial court did not err in its conclusion.

¶63　Rizwan expressed that finding a spouse was difficult given her situation as a Muslim Pakistani American woman who had been previously divorced, so she sought assistance from a marriage broker. Through this channel, she received a marriage offer from Marri. Both Marri and Rizwan considered the marriage

to be arranged, and Rizwan testified that she spoke to Marri only twice before traveling to Pakistan to marry him. Given these unique circumstances, we place significant weight on the criteria Rizwan and Brother used in determining that Marri was an acceptable match for Rizwan and on the representations regarding those criteria that Marri made before the marriage.

¶64 Prior to the marriage, Marri represented that he held a master's degree, which he had obtained while living in the United Kingdom; that he was employed as a bank branch manager; and that he owned his home in Pakistan. He further claimed that he was legally divorced from his first wife and that he had no children from that marriage. This was the limited information Rizwan and Brother received from Marri to determine whether Marri was an appropriate match. Much of this information was false, and Marri's sexual attraction to men was undisclosed. Marri's argument that his misrepresentations and identified omission would not have impacted Rizwan's decision to marry him simply falls flat. There is no reason to believe that Rizwan would have accepted Marri's proposal if he had truthfully disclosed that he was still married to his first wife and that he had less education and resulting financial stability than Rizwan was seeking, a child for whom he provided no care or support, and sexual inclinations that would result in his refusal to regularly engage in sexual intercourse with Rizwan. In sum, the trial court did not err in concluding that Marri's actions defeated Rizwan's essential purpose in contracting to marry, which was to enter a relationship with a Pakistani Muslim man who would be a trustworthy and engaged husband and father and would be able to provide financial security for Rizwan and her son. *See Haacke v. Glenn*, 814 P.2d 1157, 1159 (Utah Ct. App. 1991).

¶65 In resisting this conclusion, Marri contends that none of the topics about which he made misrepresentations or withheld information are sufficient to establish fraud that directly affected

the parties' marriage relationship. We consider each such topic in turn.

1.      Sexual Inclinations

¶66     Marri argues that withholding information regarding one's sexual orientation is not sufficient grounds for annulment. In support, he cites *Woy v. Woy*, 737 S.W.2d 769 (Mo. Ct. App. 1987), wherein a husband sought annulment after discovering that his wife used illicit drugs and "engaged in lesbian affairs which she concealed from [him]." *Id.* at 771. The court determined that this situation did not constitute grounds for annulment, reasoning:

> [The husband] testified that he had heterosexual relations with [the wife] for a ten year period, about five of which had to be before the marriage took place. Clearly the marriage was consummated and cohabitation took place up to the time the parties separated . . . . Thus, the fact that [the wife] used drugs and engaged in lesbian activities had nothing to do with consummation of the marriage or with the essential part thereof of sexual intercourse. [The husband] testified that he thought they were fine sexually. . . . Since the parties had engaged in normal sexual relations both prior to and subsequent to the marriage, there would exist no basis for [the wife] to believe that her lesbian activities would go to the very basic essential of normal and usual sexual intercourse, there was not cast upon her an affirmative duty to disclose to [the husband] her relations with other women.

*Id.* at 773–74. Marri argues that "this reasoning defeats [Rizwan's] request for annulment on the grounds of sexuality, regardless of the truthfulness of the claim." Marri's argument is unavailing.

¶67 First, *Woy* is not binding on this court, and Marri has provided no Utah case with similar reasoning. Thus, we need not follow the rationale in *Woy*, and we are disinclined to do so. Moreover, even if *Woy* applied, the facts before us are readily distinguishable from those in *Woy*. Here, Rizwan testified that she and Marri had sex only three times over the course of their marriage and that Marri showed her no physical affection, even calling her a "sexaholic" for putting her arms around him. These facts contrast sharply with the facts in *Woy*, where the couple engaged in regular sexual interactions for ten years and the husband "thought they were fine sexually." *Id.* at 773. Unlike the wife in *Woy*, whose lesbian activities, the court found, did not affect "the very basic essential of normal and usual sexual intercourse" between the couple, Rizwan testified that she believed Marri's sexual inclinations to be the reason their sexual relationship was not "normal and usual." *See id.* at 773–74. So even if *Woy* applied, it would not apply in Marri's favor.

¶68 This case is much more like *S.K. v. F.K.*, 2010 N.Y. Slip Op. 50461(U), 2010 WL 979701 (N.Y. Sup. Ct. 2010). There, the court granted an annulment after a Muslim American woman married a Pakistani man whom she later saw kissing another man. *Id.* paras. 19, 32. The woman testified that the husband never kissed her during the marriage. *Id.* para. 20. Additionally, the court found that the husband failed to disclose multiple previous marriages and engagements and made affirmative misrepresentations on various other subjects, including his income, employment, living situation, and religious practices and beliefs. *Id.* para. 30. The court found that "[v]irtually nothing about the [husband] was true" and that his "intentional lies [were] of such a nature that the only viable remedy [was] to void the contract because clearly had the [wife] known [the truth,] she would never have married him." *Id.* These facts are similar to those before us for at least two reasons. First, the woman's testimony that her husband never kissed her is akin to Rizwan's testimony that Marri never showed her physical affection and

engaged in sexual relations with her only three times during the course of the marriage. Both cases involve a situation where, unlike in *Woy*, one spouse's undisclosed sexual inclinations impacted the sexual component of the marriage relationship. Second, here, as in *S.K.*, one spouse's undisclosed sexual inclination was just one of several misrepresentations and withheld truths on which the court based its annulment decision. Indeed, the *S.K.* court determined that "[v]irtually nothing about the [husband] was true," *id.*, and the same is largely true of Marri.

¶69   We do not decide that undisclosed sexual inclinations, by themselves, necessarily qualify a marriage to be annulled based on fraud. But we do determine that Marri's undisclosed sexual inclinations were relevant to the fraud inquiry and that annulment was justified when those undisclosed inclinations are coupled with the affirmative misrepresentations Marri made on other topics and the lack of a healthy sexual relationship between the parties.

2.   Previous Children

¶70   Marri also argues that his misrepresentation about having no previous children is not a sufficient basis for a finding of fraud that directly affected the parties' marriage relationship. He asserts that this misrepresentation falls short because the other marriage candidate Rizwan and Brother considered also had a child and because Brother's reasoning on this point was that it would be difficult for Rizwan's son to adjust to another child but Marri's child from his prior marriage was not a part of his life. Marri's argument suffers from two infirmities.

¶71   First, Marri fails to acknowledge Brother's testimony that Rizwan did not accept the proposal from the other prospective match chiefly because that man had a child, demonstrating the importance Rizwan placed on her second husband not having children. And Brother's testimony was corroborated by Rizwan's

own insistence that one of her conditions for remarriage was that her new spouse not already have children.

¶72 Second, the fact that Marri's child from his first marriage never lived with Rizwan and Marri does not render Marri's misrepresentation harmless. Although Brother explained that he thought the transition would be easier for Rizwan's son if Rizwan's second husband did not already have children, this was not the limit of Rizwan's concern. For Rizwan, care and support for her son and any future children was part of the essential purpose of the marriage, and the fact that Marri already had a child he was not providing for went to the heart of that concern. Surely Rizwan would have felt differently about Marri's potential as a provider and father had Marri truthfully informed her that he had not seen or supported his daughter in some ten years.

### 3. Lack of Legal Divorce

¶73 Marri does not contend that a misrepresentation regarding still being married to a former spouse at the time of a subsequent marriage is not a sufficient basis for a finding of fraud that directly affects the marriage relationship. Instead, he asserts that the court's finding that Marri was still married at the time of his wedding to Rizwan is unsupported by the evidence. However, as reviewed above, *see supra* ¶ 51, there was evidence on which the court could base its findings regarding Marri's previous marriage and divorce. Thus, the court properly considered this misrepresentation in its fraud inquiry.

### 4. Educational Status

¶74 Marri argues that misrepresentations regarding his education and financial situation are also not sufficient grounds for a finding of fraud that directly affected the parties' marriage relationship. He again cites nonbinding authority, which states, "It is a general rule that false representation as to character, health, wealth and external conditions do not constitute such fraud as

will annul a marriage contract. In order to be such a fraud it must affect the marital relation in its essential parts." *Stepp v. Stepp*, No. 03CA0052–M, 2004 WL 626116, at *1 (Ohio Ct. App. Mar. 31, 2004) (cleaned up).

¶75 As noted above, however, because the present case deals with an arranged marriage where the parties each made the decision to marry based on limited information and little direct interaction, we place particular weight on the criteria Rizwan and Brother used in determining that Marri was an acceptable match and on Marri's prenuptial representations related to those criteria. Brother testified that educational level and financial status were key considerations. And Rizwan testified that she would not have married Marri if she knew he had lied about his education.

¶76 Still, we need not decide whether Marri's misrepresentations regarding his holding a master's degree and his level of financial security were, in themselves, sufficient grounds for a finding of fraud that directly affected the marriage relationship. Because Marri also misrepresented that he was legally divorced and did not have a child, and because he failed to disclose his sexual inclinations that prevented him from having a healthy sexual relationship with Rizwan, Marri's misrepresentations as to his education and wealth simply complete the picture of Marri's multi-fronted deception.

¶77 In sum, most of the little information about Marri that Rizwan received before proceeding with the arranged marriage turned out to be false. Under these circumstances, Marri's affirmative misrepresentations and withheld information were "material to such a degree that, had the deceived party known of the fraud, . . . she would not have consented to the marriage." *Haacke v. Glenn*, 814 P.2d 1157, 1158 (Utah Ct. App. 1991). Thus, the court did not err in determining that Marri's fraud directly affected the marriage relationship and that annulment was therefore appropriate.

## II. The Court's Evidentiary Decisions

¶78    Marri next contends that the trial court abused its discretion in some of its evidentiary decisions. Specifically, he asserts that the court erred in (1) allowing Expert to testify, (2) allowing Marri's first wife to testify, (3) admitting the fake master's degree diploma, and (4) admitting the list of websites geared toward same-sex relationships and the associated login credentials. We address each of these evidentiary decisions in turn.

### A.    Expert

¶79    Marri asserts that the trial court improperly permitted Expert to testify. He contends that Rizwan did not timely or sufficiently disclose Expert; that Expert's report was incomplete; that Expert was not qualified to provide various opinions, including "an opinion as to the validity of Mr. Marri's first divorce"; and that Expert's opinion was not based on sufficient data to be reliable. We disagree with each of these contentions.

### 1.    Timeliness and Sufficiency of the Disclosure

¶80    First, Marri argues that Expert was not timely or sufficiently disclosed. Under rule 26 of the Utah Rules of Civil Procedure, "[t]he party who bears the burden of proof on the issue for which expert testimony is offered must serve on the other parties the information required . . . within 14 days after the close of fact discovery." Utah R. Civ. P. 26(a)(4)(C)(i). "If a party fails to disclose or to supplement timely a disclosure or response to discovery, that party may not use the undisclosed witness, document, or material at any hearing or trial unless the failure is harmless or the party shows good cause for the failure." *Id.* R. 26(d)(4).

¶81    On June 8, 2022, Rizwan filed a motion indicating her desire to use Expert "to testify regarding the fraud" of using the

parties' marriage to "attempt to . . . gain US citizenship." In this motion, she reviewed the history of the shifting fact discovery deadline in this case, noting that fact discovery initially ended on January 18, 2022, but that Marri served additional discovery requests on March 23, 2022, and that at a subsequent pretrial hearing the commissioner sua sponte extended fact discovery to May 20, 2022. Then on June 6, 2022, Marri filed a notice indicating his intent to depose Rizwan. Based on these facts, Rizwan asked the court to permit Expert to testify at trial, asserting that doing so would be fair in light of the extension of fact discovery and Marri's late notice of Rizwan's deposition.

¶82 The commissioner held a hearing on these issues on June 21, 2022. The minutes for that hearing state that the commissioner recommended a determination that Rizwan's motion be deemed timely. The minutes also indicate that the deposition of Rizwan would proceed without objection. In its subsequent written order based on the commissioner's recommendation, the court did not indicate whether Rizwan's motion was timely, but it granted Rizwan's motion.

¶83 We decline to disturb the court's ruling. We first note that Marri, who bears the burden of persuasion on appeal, has not provided us with a transcript of the June 21, 2022 hearing. "A party bringing a claim of error before this court has the duty and responsibility to support such allegation by an adequate record." *State v. Case*, 2020 UT App 81, ¶ 19, 467 P.3d 893 (cleaned up). "When an appellant fails to provide an adequate record on appeal, this court presumes the regularity of the proceedings below. And when crucial matters are not included in the record on appeal, the missing portions are presumed to support the action of the trial court." *Id.* (cleaned up).

¶84 At the hearing, the commissioner may have determined that Rizwan's June 8, 2022 request to use Expert was timely because Marri's unopposed notice of intent to depose Rizwan

effectively extended fact discovery through the date of Rizwan's eventual deposition (which ended up being July 26, 2022), and, thus, also extended the expert disclosure deadline fourteen days beyond that. *See* Utah R. Civ. P. 26(a)(4)(C)(i); *De La Cruz v. Ekstrom*, 2024 UT App 18, ¶ 15, 545 P.3d 285 ("Timeliness is determined under the facts and circumstances of each particular case, and in the sound discretion of the court." (cleaned up)). Alternatively, the commissioner might have determined that Rizwan's failure to disclose Expert earlier was harmless or supported by good cause. *See* Utah R. Civ. P. 26(d)(4).

¶85 Because Marri has not provided the transcript of the June 21, 2022 hearing and there are plausible analytical bases on which the commissioner could have properly relied in recommending that Marri's request to use Expert be deemed timely, we presume the regularity of the proceedings through which the court overruled Marri's timeliness objection.[12]

---

12. Marri argues that Rizwan misled the court in obtaining its permission to use Expert. He points to Rizwan's statement in her motion that Expert would be able to provide a written report within a reasonable time before trial. From this statement, Marri draws an assumption that Rizwan intended to mislead the court because by the time she filed her motion, Expert's report already existed. The fact that Rizwan apparently had Expert's report before she filed her motion requesting permission to use Expert may have been relevant to whether Rizwan had good cause for not disclosing Expert earlier. However, as explained above, there were grounds besides good cause on which the court could have based its decision to grant Rizwan's motion to permit Expert to testify. And Rizwan did not need to specify in her motion or in her subsequent disclosure whether Expert had already prepared a report. *See* Utah R. Civ. P. 26(a)(4)(A). We therefore see no reason for reversal based on Rizwan's purportedly misleading statement.

¶86 We also reject Marri's argument that Rizwan's disclosure was insufficient. On the day the commissioner held the hearing on Rizwan's motion, Rizwan provided a notice of intent to use Expert at trial. In that notice, Rizwan stated that Expert would "testify that in light of the facts in the case, [Marri] married [Rizwan] as a pretext to enter the United States by fraud." Marri argues that there was no indication in the notice "that there would be any testimony opining that his first divorce was not finalized at the time of the parties' marriage."

¶87 However, as explained in more detail below, *see infra* ¶ 114, Marri misrepresents Expert's testimony on this point as being offered in support of an independent basis for annulment— namely, that the marriage was prohibited or void because Marri was still married. In reality, Expert testified that the status of Marri's first divorce was one of many red flags that contributed to his overall opinion that Marri's marriage to Rizwan was pretextual. While it is true that Expert described the divorce certificate as the most concerning of the facts of the case, Expert's testimony regarding Marri's divorce was a subsidiary point to his disclosed opinion that Marri entered the marriage on pretext. We therefore see no abuse of discretion in the court permitting Expert to testify based on Rizwan's disclosure.

2. Disclosure and Completeness of Expert's Report

¶88 Marri contends that Rizwan refused to provide him with a copy of Expert's report. But under rule 26, Marri should have served Rizwan notice within fourteen days of Rizwan's disclosure that he was electing either (1) to depose Expert or (2) to receive a written report from Expert. Utah R. Civ. P. 26(a)(4)(C)(i). If no such election is served, "then no further discovery of the expert must be permitted." *Id.* Rizwan's counsel emailed Marri's counsel multiple times referring to this election. One email dated July 28, 2022—after the fourteen-day election period had passed— contains a statement from Rizwan's counsel to Marri's counsel

that Marri had missed the deadline. Marri has not provided evidence to the contrary. Therefore, under rule 26, Rizwan was not required to provide Expert's report to Marri.

¶89   Marri also asserts that Expert's report was incomplete. At trial, Marri argued that Expert's report should be stricken because Expert received new information and failed to update his report. We cannot reach this issue, however, because the report is not included in the record on appeal. *See State v. Case*, 2020 UT App 81, ¶ 19, 467 P.3d 893 ("A party bringing a claim of error before this court has the duty and responsibility to support such allegation by an adequate record." (cleaned up)).

3.      Expert's Qualification to Opine on Various Topics

¶90   Marri next contends that Expert "was not qualified to provide an opinion on the issues at trial." Marri asserts that Expert was qualified only "to testify as to the date that Mr. Marri could have lawfully entered the country," not any other topics, including Marri's intent in entering the marriage and the validity of Marri's divorce from his first wife.

¶91   Under rule 702 of the Utah Rules of Evidence, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702(a). "The trial court has discretion to determine the admissibility of expert testimony, and to determine if the witness is qualified to give an opinion on a particular matter." *Anton v. Thomas*, 806 P.2d 744, 746 (Utah Ct. App. 1991). The trial court's discretion on these points is wide, "and we will not reverse unless the decision exceeds the limits of reasonability." *Wakefield v. Gutzman*, 2024 UT App 76, ¶ 38, 552 P.3d 206 (cleaned up), *cert. denied*, 558 P.3d 85 (Utah 2024).

¶92 At trial, Expert testified that he worked as a federal immigration officer for twenty-seven years with a specialty in investigating marriage fraud. He said that in that capacity he was appropriately certified and had investigated more than 500 cases. He indicated that he is now retired but stays current with developments in immigration law through continuing education and by tracking changes in the relevant rules and regulations, reading relevant cases as they are released, and taking other steps to stay up to date with trends in immigration fraud. The court noted that Expert's knowledge of fraud applies to federal laws rather than the laws of Utah, but it found him to be an expert and qualified him as such "within the field of his expertise."

¶93 We see no abuse of discretion in the court's ruling or in the court's allowance of Expert to provide his opinion as to whether Marri entered the marriage as a pretext. Indeed, Expert's extensive career in immigration fraud, with a specialty in marriage fraud, qualified him to opine on precisely that subject. That Expert was not qualified to opine about Utah law was irrelevant—Expert was qualified to opine about what the documents and facts given to him suggested about Marri's motives for marrying Rizwan and whether the facts were consistent with an intent to commit fraud.

¶94 Marri takes particular issue with Expert's testimony related to the divorce certificate from Marri's first marriage. But it is well within the purview of an expert on immigration and marriage fraud to opine on the validity and import of a purported divorce certificate. Expert testified that various facets of the certificate made it suspicious—including its date, the inclusion of the word "Talaq," its lack of mention of the couple's daughter, and its lack of a Hague Convention Apostille. This testimony fell within the scope of Expert's expertise in immigration and marriage fraud.

4.      Whether Expert's Opinion Was Reliable

¶95    Marri's final contention regarding Expert is that Expert's opinion was not based on sufficient data to be reliable and was therefore inadmissible under rule 702(b) of the Utah Rules of Evidence.

¶96    Rule 702(b) provides:

> Scientific, technical, or other specialized knowledge may serve as the basis for expert testimony only if there is a threshold showing that the principles or methods that are underlying in the testimony . . . are reliable, . . . are based upon sufficient facts or data, and have been reliably applied to the facts.

This showing "is satisfied if the underlying principles or methods, including the sufficiency of facts or data and the manner of their application to the facts of the case, are generally accepted by the relevant expert community." *Id.* R. 702(c).

¶97    Marri asserts that Expert failed to satisfy this requirement because he never interviewed Marri and limited his investigation to "asking [Rizwan] to fill out a questionnaire and send him documents she considered relevant." But Marri did not preserve this argument.

¶98    At trial, Marri objected to Expert, but he did not object on these grounds. Marri characterized his objection as being on the grounds that Expert "was not an expert," that Expert was "not timely disclosed," and that Expert did not "update [his] report."[13] Marri did not object based on reliability when Expert explained

---

13. Marri contends again on appeal that Expert fell short because he did not update his report after receiving additional evidence. As discussed above, *see supra* ¶ 89, we cannot evaluate claims related to Expert's report because the report is not in the record.

that he had reviewed the facts and documents given to him by Rizwan, without speaking to Marri.[14]

¶99 Before the court determined that Expert was qualified to testify about immigration fraud and marriage fraud, Marri's counsel interrupted Rizwan's counsel's questioning of Expert about his "protocol in terms of how [he] would approach marriage fraud." After Expert referred to two federal court cases to explain that the proper protocol was to "look at the conduct of the parties prior to and after entering into the marriage to determine [their] subjective intent," Marri's counsel argued that this information was not relevant because a "federal statute doesn't help us understand intent."

¶100 In other words, Marri's objection below was not that Expert's methods were not generally accepted by the relevant expert community; instead, his objection was that Expert had experience and expertise with federal law rather than Utah law. That objection is not properly characterized as falling under rule 702(b); instead, it falls under rule 702(a). In essence, Marri argued that Expert should not be permitted to testify because his specialized knowledge, which did not include familiarity with Utah law, would not "help the trier of fact to understand the evidence or to determine a fact in issue." Utah R. Evid. 702(a). And the rule 702(b) issue Marri raises now was not preserved by his rule 702(a) objection below. Because the rule 702(b) issue is

_____

14. Expert testified that "in an investigation to determine marriage fraud, it's not necessary, nor is it required," to interview the immigrant. Marri has provided no evidence contradicting this or showing that the decision not to interview the immigrant is not accepted in the community of immigration and marriage fraud investigators. Thus, even were we to reach the merits of this issue, we likely would not disturb the trial court's discretionary implicit determination that Expert satisfied the threshold requirements of rule 702(b).

unpreserved, we do not address it. *See, e.g.*, *State v. Schwenke*, 2009 UT App 345, ¶ 10, 222 P.3d 768 ("An appellate court will not address the merits of an argument that has not been preserved absent either plain error or exceptional circumstances." (cleaned up)).[15]

B.     Marri's First Wife

¶101   Marri asserts that the trial court improperly permitted his first wife to testify as well. Even if the court improperly allowed Marri's first wife to testify, however, we will not reverse the court's decision "unless there is a reasonable likelihood that the error affected the outcome of the proceedings." *Capozzoli v. Madden*, 2024 UT App 176, ¶ 33, 561 P.3d 727 (cleaned up); *see also* *Steffensen v. Smith's Mgmt. Corp.*, 820 P.2d 482, 489 (Utah Ct. App. 1991) ("On appeal, the appellant has the burden of demonstrating an error was prejudicial—that there is a reasonable likelihood that the error affected the outcome of the proceedings." (cleaned up)). Without deciding whether the court erred in allowing Marri's first wife to testify, we determine that there is no reasonable likelihood that the admission of his first wife's testimony affected the outcome of the proceedings.

¶102   Marri's complains of his first wife's testimony regarding (1) "the sufficiency of [Marri's] divorce from" her and (2) "her belief about [his] sexual orientation." As discussed above, *see supra* ¶¶ 51, 51 n.8, we have determined that even without Marri's first wife's testimony, the court had sufficient evidence on which to base its finding that Marri misrepresented that he was legally divorced from his first wife when he married Rizwan. Specifically, Expert testified that he found the document Marri

---

15. Marri makes a specific argument that Expert was not qualified to opine about the meaning of "Talaq." He did not object below—on any grounds—to Expert's testimony related to that term. Hence, this issue is also unpreserved.

represented as the divorce certificate for Marri's first marriage highly suspicious, and he opined that Marri and his first wife were not legally divorced. Expert offered this testimony in support of his opinion that Marri married Rizwan to obtain an immigration benefit, and the court determined that the "basis" for Expert's opinion in that regard was credible. In light of Expert's testimony and the court's express determination that his testimony was credible, we are of the view that there is no reasonable likelihood the court would have made different findings regarding Marri's lack of legal divorce from his first wife if his first wife had not testified.

¶103   Similarly, we have determined that the court had sufficient evidence related to Marri's sexual inclinations to reach its findings on that topic based on Rizwan's testimony alone. *See supra* ¶¶ 52, 52 n.9. While Marri's first wife also testified as to Marri's sexual interest in men, Rizwan's testimony—which the court deemed credible—established that Marri repeatedly viewed gay pornography, had login credentials associated with websites geared toward same-sex relationships, and had the Grindr app, making the fact that Marri was sexually attracted to men when he married Rizwan very highly probable.

¶104   Moreover, the court's reference in its order to the testimony of Marri's first wife on this point was limited: "[Marri's] first wife from Pakistan testified that [Marri] acknowledged [to her,] while [they were married,] and [to] family members that he was a homosexual." On the other hand, the court referenced multiple portions of Rizwan's testimony related to Marri's sexual interests. We are therefore not persuaded that there is a reasonable likelihood that the court would have made different findings regarding Marri's sexual interests if his first wife's testimony had not been admitted.

¶105   For the foregoing reasons, Marri's argument for reversal based on the admission of his first wife's testimony fails. *See Capozzoli*, 2024 UT App 176, ¶ 33; *Steffensen*, 820 P.2d at 489.

C.      The Fake Master's Degree Diploma

¶106   As discussed above, *see supra* ¶ 54, we have further concluded that the court had sufficient evidence before it related to Marri's misrepresentation that he held a master's degree. This conclusion rests not on the fake diploma itself but on the testimony of Rizwan, Brother, and Marri. Rizwan testified that Marri told her he had a master's degree from a university in the United Kingdom and that he sent a copy of a diploma indicating as much through WhatsApp before the wedding and showed her the same diploma when she came to Pakistan. Marri has not argued on appeal that Rizwan's testimony on this point was improper. Brother likewise testified that, prior to the marriage, Marri represented that he had studied in the United Kingdom and obtained both bachelor's and master's degrees. Marri then admitted at trial that he did not have a master's degree.

¶107   Moreover, the court's order did not make findings about the fake diploma itself but, rather, that Marri's testimony was not credible on several points, including his claim that he did not falsely report having a master's degree or provide educational certificates. *See generally Holt v. Holt*, 655 P.2d 677, 678 (Utah 1982) ("If the court did not rely on [the improperly admitted] evidence, the error [in admitting the evidence] was harmless.").

¶108   For these reasons, any purported error in the admission of this document was also harmless. *See Holt*, 655 P.2d at 678; *Capozzoli v. Madden*, 2024 UT App 176, ¶ 33, 561 P.3d 727; *Steffensen v. Smith's Mgmt. Corp.*, 820 P.2d 482, 489 (Utah Ct. App. 1991).

D.     The List of Websites and Login Credentials

¶109   As to the court's admission of the list of websites geared toward same-sex relationships along with the associated login credentials, Marri failed to preserve the issue for our review. At trial, Marri initially objected to the list for lack of foundation. This objection was overruled based on Rizwan's testimony that she found the list in Marri's closet in Pakistan. When Rizwan's counsel later moved for the list to be admitted into evidence, the court asked if there were any objections, and Marri's counsel responded, "No objections."

¶110   Marri acknowledges that he did not preserve at trial the issue of the list's admissibility. But he asserts that his pretrial and post-trial objections preserved the issue for our review. However, Marri's counsel's affirmation at trial that he had no objections to admission of the list superseded his pretrial objection. *Cf. State v. C.D.L.*, 2011 UT App 55, ¶ 22, 250 P.3d 69 (holding that where the trial court "deferred ruling on [an] objection" until trial, "the trial court's deferred ruling left it up to . . . trial counsel to reraise [the] objection at trial in order to preserve that issue for appeal"). And "an objection that could have been raised at trial cannot be preserved in a post-trial motion." *State v. Fullerton*, 2018 UT 49, ¶ 49 n.15, 428 P.3d 1052.

¶111   Accordingly, Marri did not preserve the issue of the list's admissibility for our review, and we decline to address it.

III. The Court's Denial of Marri's Motion for a New Trial

¶112   Marri next argues that the trial court abused its discretion in refusing to grant his motion for a new trial on the basis of surprise. Marri contends that Rizwan "never identified that she was seeking an annulment on the grounds of the insufficiency of [Marri's] divorce from his ex-wife" and that Rizwan "alleged for the first time in the middle of trial that [Marri] was not lawfully

divorced from his first wife under the laws of Pakistan at the time the parties were married."

¶113   One possible basis for a trial court to grant a new trial under rule 59 of the Utah Rules of Civil Procedure is "accident or surprise that ordinary prudence could not have guarded against." Utah R. Civ. P. 59(a)(3). "Generally, we afford trial judges wide latitude in granting or denying rule 59 motions . . . because the trial court, having heard the evidence, typically is in a better position to determine whether the grant or denial of a rule 59 motion is warranted." *Sanpete Am., LLC v. Willardsen*, 2011 UT 48, ¶ 28, 269 P.3d 118 (cleaned up). "A motion for a new trial invokes the sound discretion of the trial court, and appellate review of its ruling is quite limited." *ASC Utah, Inc. v Wolf Mountain Resorts, LC*, 2013 UT 24, ¶ 21, 309 P.3d 201 (cleaned up). "We will reverse a district court's ruling on a motion for a new trial only if there is no reasonable basis for the decision." *Id.* (cleaned up).

¶114   Here, the trial court determined that none of the listed bases under rule 59—including surprise—applied. The court had a reasonable basis for denying the motion with respect to surprise. Marri misconstrues the nature of the evidence related to his divorce from his first wife as a new claim brought at trial, but Rizwan affirmed to the trial court that she was seeking an annulment based on common law fraud. *See generally* Utah Code § 81-4-302(2). This basis for annulment is distinct from the other permissible basis for annulment, namely, that "the marriage is [statutorily] prohibited or void." *Id.* § 81-4-302(1). Had Rizwan argued that she was entitled to an annulment because Marri was still married to his first wife, thereby rendering the marriage to Rizwan statutorily prohibited as void, this could constitute surprise in the form of a new claim asserted for the first time at trial. Instead, Rizwan argued that she was entitled to an annulment because Marri committed common law fraud, in part because he misrepresented that he was legally divorced from his first wife. This is a critical distinction. Marri was on notice that

Rizwan planned to provide evidence of various misrepresentations by Marri. And in her amended counterclaim, Rizwan asserted that Marri misrepresented facts about his divorce. Thus, it was within the trial court's broad discretion to deny Marri's motion for a new trial on the basis of surprise.

IV. The Child Support Arrears Calculation

¶115 Finally, Marri argues that the court erred in calculating his child support arrears.

¶116 The court calculated Marri's income by using the hourly wage from Marri's July 2022 paystubs and September 2022 financial declaration, $26.52, and imputing a forty-hour work week, for a gross monthly income of $4,596.80. The court used this number to determine child support arrears from April 2021 (when the parties separated) through December 2022 (the month when the trial concluded).

¶117 Marri points to various filings to demonstrate that he earned less than that income during that time: his divorce petition indicating that at that time he earned $15.30 per hour for forty hours per week, for a monthly income of $2,652; his financial declaration from August 2021 indicating that he then earned $23 per hour, for a monthly income of $3,987; his financial declaration from May 2022 indicating a wage of $25 per hour; his July 2022 paystubs and his September 2022 financial declaration, both of which were admitted into evidence and used at trial, showing that while he earned $26.52 per hour, he worked thirty-five to thirty-six hours per week, making his monthly income less than $4,596.80. Marri argues that in the face of this evidence, the court erred by (1) using his July 2022 hourly wage to calculate his income for periods prior to July 2022 and (2) imputing a forty-hour work week. We conclude that the court acted within its discretion in using Marri's July 2022 hourly wage for the period from April 2021 through December 2022 and that Marri invited any error related to the imputation of a forty-hour work week.

¶118 Marri provided no evidence at trial of his income from April 2021 to December 2022 except his July 2022 paystubs and his September 2022 financial declaration, which both identified a wage of $26.52 per hour. While Marri's earlier pleadings and disclosures identified other hourly rates for earlier periods, he failed to provide or to point to those documents at trial. The court's use of the evidence of Marri's hourly wage provided to it at trial was not an abuse of discretion. *See Burggraaf v. Burggraaf*, 2019 UT App 195, ¶ 24, 455 P.3d 1071 ("Because district courts have broad discretion to award child support, we will not disturb such decisions absent an abuse of discretion." (cleaned up)); *cf. Clarke v. Clarke*, 2023 UT App 160, ¶ 62, 542 P.3d 935 ("If a party offers into evidence only time-of-trial expense amounts, and does not provide the court with any evidence of pre-separation expenses (to the extent they are different), that party has no right to complain when the court awards the time-of-trial amounts."). And because the earlier pleadings and disclosures did not constitute "newly discovered material evidence that could not, with reasonable diligence, have been discovered and produced at the trial," Utah R. Civ. P. 59(a)(1)(4), the court did not abuse its discretion when it did not alter its arrears calculation in response to Marri's rule 59 motion.

¶119 Finally, Marri invited any error related to the imputation of a forty-hour work week. "Under the doctrine of invited error, an error is invited when counsel encourages the trial court to make an erroneous ruling." *State v. McNeil*, 2016 UT 3, ¶ 17, 365 P.3d 699. "A party who leads a court into error cannot later complain of that error to obtain reversal." *Merriam v. Merriam*, 799 P.2d 1172, 1175–76 (Utah Ct. App. 1990).

¶120 During trial, the court asked if Marri would object to calculating his income based on an imputed forty-hour work week, and counsel replied, "I certainly hope that the same courtesy be shown him, but I will agree, Your Honor." In so saying, Marri invited any error with regard to the imputation of a

forty-hour work week. That Marri expressed a desire for the court to impute a forty-hour work week to Rizwan as well and the court ultimately did not do so does not alter the impact of Marri's invited error. Marri's counsel's references to "hope" and "courtesy" indicate that his agreement to the imputation to Marri of a forty-hour work week was not contingent on the same imputation to Rizwan. Moreover, when the court later used a twenty-hour work week in calculating Rizwan's income—despite initially suggesting that it would impute a forty-hour work week to her as well—Marri did not object or withdraw his prior stipulation. Based on Marri's stipulation, the court did not abuse its discretion by imputing a forty-hour work week to Marri at trial or by not altering that imputation after trial.

¶121   For these reasons, Marri's claim of error in the calculation of his child support arrears is not well taken.

CONCLUSION

¶122   We are not persuaded by any of Marri's claims of trial court error. We therefore affirm.

———————